## PETER BARTON *v.* CITY OF BRISTOL ET AL.
### (SC 17953)

Rogers, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued December 2, 2008—officially released April 14, 2009

*Michelle N. Holmes*, for the appellant (plaintiff).

*Diana Garfield*, for the appellees (named defendant et al.).

*Harry B. Elliott, Jr.*, for the appellee (defendant AFSCME, Council 15, Local 754, AFL-CIO).

*Opinion*

ROGERS, C. J. The plaintiff, Peter Barton, brought this action against the defendants, the city of Bristol (city), John DiVenere, the city's chief of police, and AFSCME, Council 15, Local 754, AFL-CIO (union), alleging that the city and DiVenere had violated General

Statutes § 7-294aa (a)[1] by refusing to restore the plaintiff to his position on the Bristol police department after he had resigned from his employment in order to serve temporarily in peacekeeping operations in the country of Iraq. The plaintiff further alleged that the union had made negligent representations to him regarding his rights under § 7-294aa. After a trial to the court, the trial court rendered judgment in favor of the defendants. The plaintiff then brought this appeal,[2] claiming that the trial court improperly determined that: (1) the plaintiff's activities in Iraq had not been with an entity under the supervision of a qualified sponsoring organization under § 7-294aa; (2) the plaintiff did not come within the scope of § 7-294aa because he had not resigned from his employment with the Bristol police department but, instead, had retired; (3) the union had not negligently represented that § 7-294aa applied to the plaintiff; and (4) the union had not negligently represented that it would represent the plaintiff upon his return from Iraq. We affirm the judgment of the trial court.

The trial court found the following undisputed facts. The plaintiff began his employment with the Bristol police department in 1977. In 2004, he was a detective sergeant. As a member of the police department, the plaintiff was represented by the union.

---

[1] General Statutes § 7-294aa (a) provides in relevant part: "Any sworn police officer employed by the state or a municipality who takes a leave of absence or resigns from such officer's employment on or after September 11, 2001, to volunteer for participation in international peacekeeping operations, is selected for such participation by a company which the United States Department of State has contracted with to recruit, select, equip and deploy police officers for such peacekeeping operations, and participates in such peacekeeping operations under the supervision of the United Nations, the Organization for Security and Cooperation in Europe or other sponsoring organization, shall be entitled, upon return to the United States, (1) to be restored by such officer's employer to the position of employment held by the officer when the leave commenced . . . ."

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and this court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

In February, 2004, the plaintiff sent his resume to the recruiting office of DynCorp International FZ-LLC (DynCorp), a private company that contracts with the United States Department of State to recruit, select, equip and deploy police officers for overseas service. At some point thereafter, the plaintiff learned of the enactment of § 7-294aa and sought the opinion of Ken Gallup, the union's president, as to whether he believed that the statute would apply to him if he sought employment with DynCorp. Gallup indicated that he believed that the statute would apply to the plaintiff.

On July 28, 2004, the plaintiff requested a military leave of absence from the Bristol police department so that he could work for DynCorp. DiVenere denied the request because the plaintiff was not a member of the military. On August 4, 2004, the plaintiff applied for an unpaid personal leave of absence pursuant to the union's collective bargaining agreement. While the plaintiff was waiting for the city's response to his request for an unpaid leave, Gallup suggested that the plaintiff resign his position as a police officer, as authorized by § 7-294aa. The plaintiff and Gallup gave conflicting testimony at trial as to whether Gallup told the plaintiff that the union would represent him upon his return from Iraq in connection with his efforts to be reinstated to his position.

On September 4, 2004, while he was still awaiting a decision from the city on his request for an unpaid leave of absence, the plaintiff sent a draft resignation letter to Eric Brown, a staff attorney for the union. In the draft letter, the plaintiff stated: "Since with my resignation my retirement benefits will start, I am requesting that I not receive, nor will I accept at this time, payment for any unused sick time as I intend to return to such employment." Thereafter, Brown gave the plaintiff some suggestions regarding the language of the letter. Brown told the plaintiff that he believed that § 7-294aa would

apply to the plaintiff's situation and that the plaintiff would be reinstated as a police officer upon his return from Iraq. Brown also told the plaintiff that he was concerned about the eligibility of the plaintiff's spouse for survivor benefits if the plaintiff were to die in Iraq without having requested his pension benefits in writing. Brown further stated that the union probably would represent the plaintiff when he returned to Connecticut, but that he could not guarantee that it would do so. The plaintiff testified at trial, however, that he would have gone to Iraq even if Brown had told him that the union would represent him only in connection with his rights under the collective bargaining agreement.

On September 14, 2004, the plaintiff left Connecticut for DynCorp training and subsequently went directly to Iraq. On September 20, 2004, DiVenere denied the plaintiff's request for a personal leave of absence.

Before going to Iraq, the plaintiff had given his wife a signed but undated letter addressed to the city that included the revisions suggested by Brown. The plaintiff's wife dated the letter October 1, 2004, and sent it to Diane Ferguson, the city's director of personnel. In the letter, the plaintiff stated that he "resign[ed]" from his position with the Bristol police department. He further stated that, "[as] a result of my resignation, I intend to claim all retirement benefits owed to me, immediately, except for the following: Unused sick time payout, which I intend to have remain in a bank for use upon my return to service in the police department." On October 29, 2004, Ferguson sent a letter to the plaintiff, with a copy to Brown, in which she stated that the city did not distribute retirement benefits piecemeal, and that the city would disburse the unused sick leave payout immediately in accordance with the terms of the collective bargaining agreement. Brown then sent a letter to Ferguson stating that it was the union's position that, under § 7-294aa, the plaintiff would be able to return

to his position as a police officer after his return from Iraq, and that the city should hold the plaintiff's sick time payout in escrow in the expectation that, upon his return, he would require the full benefit. Brown stated that "it seems wiser for the [c]ity to simply hold the payout in escrow until all controversies are resolved upon [the plaintiff's] return." Ferguson denied Brown's request. Thereafter, retroactive to the date of the plaintiff's letter, the city provided retirement benefits to the plaintiff consisting of a pension, an unused sick leave payout in the amount of $22,386.85, and health insurance.

At a union executive board meeting in April, 2005, the board voted that it would not represent former union members who were attempting to be reinstated under § 7-294aa. Thereafter, Brown sent the plaintiff a letter stating: "The rights which accrue to individuals under [§ 7-294aa] are individual rights, and not rights related to any labor agreement or labor statute. The [e]xecutive [b]oard has determined that because you are no longer a member of the union, and because in your situation you are not entitled to representation pursuant to any authority under the international, council, or local union constitution, bylaws, or collective bargaining agreement, the union will not represent you."

The plaintiff returned from Iraq on September 22, 2005. By letter dated October 10, 2005, the plaintiff requested that the city reinstate him as a detective sergeant with the police department pursuant to § 7-294aa. DiVenere responded with a letter stating that the plaintiff had retired the previous fall and that the city would not reinstate him.

Thereafter, the plaintiff brought this action alleging that the city and DiVenere had violated § 7-294aa by refusing to reinstate him to his position as a police

detective with the Bristol police department. He also alleged that the union had negligently misrepresented to him that it would represent him in connection with his efforts to be reinstated and that he would be entitled to reinstatement under § 7-294aa.

After a trial, the court rejected these claims. In its memorandum of decision, the trial court concluded that the statute did not apply to the plaintiff because he had not presented any evidence that DynCorp was an international peacekeeping mission under the supervision of the United Nations, the Organization for Security and Cooperation in Europe or other sponsoring organization, as required by the statute. As an independent ground for rejecting the plaintiff's claim under § 7-294aa, the court determined that the plaintiff had retired from his position, and that § 7-294aa applies only to police officers who resign from their positions, not to those who retire. With respect to the plaintiff's claims against the union, the trial court determined that the union had not made a misrepresentation of fact that it knew or should have known was false, but had merely offered an opinion regarding the applicability of § 7-294aa to the plaintiff's situation. In addition, the court found that the plaintiff had not proved that the union had misrepresented facts because the evidence showed that Brown had indicated that he could not guarantee that the union would represent the plaintiff upon his return from Iraq. Moreover, even if the union had misrepresented its intentions, the plaintiff had not established that he had relied on any such misrepresentation in making his decision to go to Iraq. Rather, the plaintiff had testified that he would have gone to Iraq even if he had known that the union would not represent him in matters unrelated to the collective bargaining agreement. Accordingly, the trial court rendered judgment for the defendants.

This appeal followed.[3] We conclude that the trial court properly determined that the plaintiff had retired and that § 7-294aa does not apply to retired police officers. We further conclude that the union had not made negligent misrepresentations to the plaintiff. Accordingly, we affirm the judgment of the trial court on these grounds, and we need not address the plaintiff's claim that the trial court improperly determined that DynCorp was not a qualified sponsoring organization under § 7-294aa.

## I

We first address the plaintiff's claims that the trial court improperly determined that: (1) he had retired; and (2) § 7-294aa does not apply to retired police officers. We disagree.

## A

The trial court held that, "in order for the plaintiff to receive his pension benefits, the plaintiff was required to affirmatively request them in writing. . . . The plaintiff, Ferguson and Brown all testified that, while it did not make much financial sense to do so, the plaintiff could have resigned and either received back his contributions to the pension plan or left them uncollected until he returned. The plaintiff . . . chose to exercise his option to permanently retire and start receiving his pension benefits." (Citation omitted.)

The plaintiff claims, to the contrary, that "a vested employee who resigns *or* retires is entitled to [a] pension" and, therefore, the fact that he received a pension did not establish that he had retired. (Emphasis added.)

[3] In addition to the claims raised by the plaintiff, as previously set forth, the city and DiVenere claim, as an alternate ground for affirmance, that § 7-294aa constitutes a public emolument in violation of article first, § 1, of the constitution of Connecticut. Because we reject the plaintiff's claims, we need not address this alternate ground for affirmance.

In support of this claim, he points to Ferguson's testimony that a police officer who resigned, but did not retire, "would either be allowed to have the money just sit there in the pension account or he could begin collecting a benefit."[4]

The facts surrounding the plaintiff's cessation of employment with the city are not in dispute. Accordingly, the question we must resolve is whether, under the collective bargaining agreement and the municipal ordinances that the agreement incorporates by reference, the plaintiff's conduct constituted a resignation

---

[4] The following exchange occurred at trial between counsel for the city and Ferguson:

"[Counsel for the City]: Now, if an officer with [twenty-five] years of service retires, what would he get?

"[Ferguson]: He would get a pension, with increases to that pension based on current officers' salary increases. Each year there would be an increase to that depending on what the bargaining agreement provided for. There would be retiree health care, and also the sick leave payout at [45] percent.

"[Counsel for the City]: Now, if an officer with [twenty-five] years of service resigned, but does not retire, would he get those benefits?

"[Ferguson]: An officer who resigns would not get the sick leave payout or the health insurance."

Thereafter, the following exchange occurred between the trial court and Ferguson:

"The Court: If somebody resigns, uses the word 'resign' rather than retire, you said they do not get sick leave or health insurance?

"[Ferguson]: Correct.

"The Court: Do they get their pension?

"[Ferguson]: On a resignation?

"The Court: Yes.

"[Ferguson]: It would depend on their status when they left, if they were vested or not vested.

"The Court: Okay. Take [the plaintiff]. If he wrote you a letter and said, 'I hereby resign from the Bristol police department' what occurs then? You start paying him his pension?

"[Ferguson]: If he resigned?

"The Court: Yeah.

"[Ferguson]: He would either be allowed to have the money just sit there in the pension account or he could begin collecting a benefit.

"The Court: So the only difference would be that he could not get health insurance and what? Sick leave?

"[Ferguson]: A sick leave payout, which factors into his pension."

from his employment with the Bristol police department or a retirement. To the extent that the provisions of the collective bargaining agreement are ambiguous, "the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) *David M. Somers & Associates, P.C.* v. *Busch,* 283 Conn. 396, 403, 927 A.2d 832 (2007). To the extent that the provisions are unambiguous, our standard of review is plenary. See *O'Connor* v. *Waterbury,* 286 Conn. 732, 744, 945 A.2d 936 (2008) ("[i]f a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review" [internal quotation marks omitted]).

We begin our analysis with a review of the relevant provisions of the collective bargaining agreement and the Bristol Code of Ordinances. Section 27:1 of article XXVII of the collective bargaining agreement provides that "[t]he pension system for all regular members of the Bristol [p]olice [d]epartment shall remain in effect as set forth in [§] 2-90 of the Code of Ordinances . . . ." Section 2-90 (g) of article II of the Bristol Code of Ordinances (2005) provides that "[t]he board of police commissioners shall permanently retire on half pay any member of the police department, upon his written request when such member shall have completed twenty-five . . . years of continuous service in the department as a regular policeman." Section 2-90 (k) of article II of the Bristol Code of Ordinances (2005) provides that, "upon separation from employment with the Bristol [p]olice [d]epartment, [a fully vested] employee may elect not to withdraw the assessments paid into the fund by him, and instead to collect, upon reaching the age when he would have been eligible for a normal (half-pay) pension, a retirement allowance . . . ."

The plaintiff claims that, under these provisions, he was entitled to receive a pension upon his resignation from the police department even if he did not retire and, therefore, his request for a pension did not trigger his retirement. The city claims, to the contrary, that a police officer who resigns, but does not retire, is not entitled to a pension. We conclude that the collective bargaining agreement is ambiguous in this regard, but that we need not resolve this ambiguity because the collective bargaining agreement unambiguously provides that health insurance and sick leave benefits are not available to police officers who resign, but do not retire.[5] Section 14:13 of article XIV of the collective

---

[5] Section 2-90 (k) of the Bristol Code of Ordinances (2005) could be interpreted as providing that a fully vested police officer who resigns and subsequently reaches "the age when he would have been eligible for a normal (half-pay) pension" is entitled to a pension regardless of whether he retires. Under this interpretation, it seems that the plaintiff would have been entitled to receive a pension without triggering the mandatory permanent retirement provisions of § 2-90 (g). The collective bargaining agreement could also be interpreted, however, as simply contemplating two types of retirement. First, a police officer could retire directly from the police department under § 2-90 (g), which would entitle the police officer to an immediate pension, health insurance and a sick leave payout. Second, under § 2-90 (k), a fully vested police officer could first resign from the police department and then retire upon reaching normal retirement age, which would entitle the police officer to a pension. Under this interpretation, the plaintiff's request for a pension would have triggered retirement under either § 2-90 (g) or § 2-90 (k).

This ambiguity in the collective bargaining agreement is reflected in the testimony at trial. Ferguson testified that, when an officer with twenty-five years of service retires, he receives a pension, health insurance and a sick leave payout. Counsel for the city then asked Ferguson what benefit a police officer with twenty-five years of service would receive if he resigned, but did not retire. Ferguson responded that "[a]n officer who resigns would not get the sick leave payout or the health insurance," thereby suggesting that he *would* get a pension. She also testified that, if the plaintiff had resigned, "[h]e would either [have been] allowed to have the money just sit there in the pension account or he could [have begun] collecting a benefit." See footnote 4 of this opinion. Ferguson further testified, however, that, "if for some reason you choose to resign and not take your pension, a resignation has different meaning under the contract than retirement," thereby suggesting that retirement is triggered by receiving a pension.

bargaining agreement provides in relevant part that "upon *retirement* . . . of an employee, [44] percent . . . of all unused sick leave shall be paid to the employee . . . ." (Emphasis added.) Section 20:6 of article XX of the collective bargaining agreement provides in relevant part: "For employees who *retire* on or after July 1, 1988, the [c]ity will pay the cost of health insurance coverage for [the] retiree and spouse for the first ten . . . years after retirement . . . ." (Emphasis added.) Section 20:6.4 of article XX of the collective bargaining agreement provides in relevant part that "[t]he benefits described in this section shall only apply in cases of *full normal retirement* after twenty-five . . . years of service . . . ."[6] (Emphasis added.)

The plaintiff did not address these specific provisions in his brief to this court, at closing arguments before the trial court or in his trial brief. Rather, he asserted generally that there is no distinction between resignation and retirement *under § 7-294aa.* Even if that were the case, however, that would not mean that there is no such distinction under the collective bargaining agreement. Section 2-90 (k) of the Bristol Code of Ordinances clearly contemplates—and common sense dictates—that a police officer may separate from employment with the police department—i.e., he may resign—without retiring. The plaintiff concedes that, upon separating from employment, he could have left his contributions in the pension fund under § 2-90 (k) without triggering the mandatory permanent retirement

---

[6] At trial, counsel for the plaintiff asked Ferguson where the collective bargaining agreement provided that a police officer is not entitled to health insurance or a sick leave payout upon resignation. Ferguson responded: "It says it in the sick leave, under retirement, that upon retirement—the word is retirement, not resignation. If you resign, you don't get the sick leave benefits." Ferguson presumably was referring to § 14:13 of article XIV of the collective bargaining agreement. Ferguson also testified that the health insurance provision of the collective bargaining agreement, article XX, specified that a police officer would receive that benefit upon retirement.

provision in § 2-90 (g).[7] It is also clear under § 14:13 of article XIV, and §§ 20:6 and 20:6.4 of article XX of the collective bargaining agreement, that the city has no obligation to provide a sick leave payout and health insurance to a police officer who has not retired.

In the present case, the plaintiff requested that the city distribute "all retirement benefits," except his sick leave payout, "immediately" on the date of his resignation. He further requested that the city hold his sick leave payout "in a bank for use upon [his] return to the police department." Although the plaintiff requested that the city not distribute his sick leave payout *immediately*, it is reasonable to conclude from Ferguson's testimony that police officers who resign under § 2-90 (k) of the Bristol Code of Ordinances are not entitled to a sick leave payout when they resign, and only police officers who retire immediately upon separation from the police department are entitled to that benefit. See footnote 5 of this opinion. Indeed, the city informed the plaintiff that "[r]etirement benefits are not distributed piecemeal" and that continuation of his sick leave benefit was not an option, but that the city was required to distribute the sick leave payout immediately "upon retirement" under the collective bargaining agreement. The plaintiff did not dispute the characterization of his status as retirement, contend that he was entitled to health insurance and sick leave even if he did not retire, or inform the city that he did not wish to retire or to accept the benefits if accepting them meant that he had to retire.[8] Thus, the plaintiff accepted retirement

---

[7] In his brief to this court, the plaintiff states that "resignation from employment affects the [payout] of his pension whether he wants it to or not." In the very next sentence, however, he states that, "[s]imply because [he] did not exercise his *option* to leave his benefits sitting in [the city's] bank account does not change his status to one of retiree." (Emphasis in original.) Thus, he concedes that he could have resigned without requesting a pension.

[8] Brown's November 5, 2004 letter to Ferguson stated that it was the union's position that the plaintiff would be entitled to reinstatement under § 7-294aa after he returned from Iraq. That position, however, was not

benefits—health insurance and a sick leave payout—that are not available to police officers who resign under § 2-90 (k) of the Bristol Code of Ordinances, and are available only to police officers who retire. Accordingly, we conclude that the trial court properly determined that the plaintiff had retired.

B

Having concluded that the trial court properly determined that the plaintiff was retired from the Bristol police department under the collective bargaining agreement and city ordinances, we turn to the question of whether the court properly determined that the plaintiff did not come within the scope of § 7-294aa. Whether a police officer who has retired in order to participate in international peacekeeping operations comes within the scope of § 7-294aa is a question of statutory interpretation over which our review is plenary. See *Dept. of Transportation* v. *White Oak Corp.*, 287 Conn. 1, 7, 946 A.2d 1219 (2008). "General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of

---

inconsistent with a belief that the plaintiff had retired. Indeed, the plaintiff testified at trial that it was his belief that "retirement and resignation are interchangeable" under § 7-294aa, and that Brown shared that belief.

The plaintiff states in his brief to this court that he "made clear to [the defendants] on repeated occasions that he was not retiring and intended to return to employment upon completion of the one year in Iraq. In fact, [the] plaintiff spoke to [DiVenere], the mayor, his union, and the administration about his intent to return well before he left for Iraq." The portion of the trial transcript that the plaintiff cites in support of this claim contains the plaintiff's testimony that he told the mayor of the city and DiVenere that he wanted to take a leave of absence to go to Iraq and that the city's personnel department never advised him of the "ramifications . . . of the manner in which [he was] leaving" after the city denied his requests for a leave of absence. Although the record supports the plaintiff's claim that the city knew that he wanted to be reinstated upon his return from Iraq, the plaintiff has pointed to no evidence that, after the city denied his requests for a leave of absence, he told the city that he did not want to retire.

such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 8.

We begin our analysis with the language of the statute. Section 7-294aa (a) provides in relevant part: "Any sworn police officer employed by the state or a municipality who . . . resigns from such officer's employment on or after September 11, 2001, to volunteer for participation in international peacekeeping operations . . . shall be entitled, upon return to the United States, (1) to be restored by such officer's employer to the position of employment held by the officer when the leave commenced . . . ." Although, in the context of § 7-294aa (a), the phrase "resigns from . . . employment" reasonably may be understood to mean "voluntarily separates from employment," the statute simply does not address the question of whether it applies to a police officer who has *both* voluntarily separated from employment *and* retired and who, therefore, has a specific legal status that is distinct from the status of a police officer who has merely resigned. Accordingly, we may "look for interpretive guidance to the legislative history and circumstances surrounding [the] enactment [of § 7-294aa], to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Dept. of Transportation* v. *White Oak Corp.*, supra, 287 Conn. 8.

There is no dispute that the primary purpose of § 7-294aa was to encourage participation in international peacekeeping operations following in the wake of the September 11, 2001 terrorist attacks. We also acknowledge that requiring municipalities to reinstate police officers who have retired permanently, such as under § 2-90 (g) of the Bristol Code of Ordinances, in order to participate in such operations would not be inconsistent with this purpose. It is clear, however, that such a requirement would create a new legal status—temporary retirement—that would be in direct conflict with the mandatory permanent retirement provision of § 2-90 (g), which is incorporated by reference in § 27:1 of article XXVII of the collective bargaining agreement. In addition, the requirement could impose significant financial burdens on the city and interfere with the orderly administration of its retirement system.[9] In the absence of any express provision in the statute, we will not presume that the legislature intended to invalidate existing contractual provisions or to impose these burdens.[10] Cf. *State* v. *DeJesus*, 288 Conn. 418, 454 n.22, 953 A.2d 45 (2008) ("[a]lthough the legislature may eliminate a common law right by statute, the presumption

[9] It is not clear from the record what would happen upon the plaintiff's reinstatement as a police officer. The parties have not indicated whether, upon reinstatement, the plaintiff would be required to reimburse the city for the retirement benefits that he received or whether he would be entitled to continue to receive his pension after his reinstatement, in addition to his regular compensation. In any event, the record reflects that, if the plaintiff had resigned, the city would not have paid for the plaintiff's health insurance during his year in Iraq or distributed his sick leave payout, and it seems safe to conclude that his reinstatement would entail serious administrative difficulties for the city. Indeed, the plaintiff testified that "it was going to be a big problem trying to either reimburse money or get my [sick leave] hours back into the sick time clause, especially with a new contract being negotiated that had to do with sick time."

[10] We also note that, if the legislature had expressed such an intention, the statute would be constitutionally suspect under article one, § 10, of the United States constitution, which provides in relevant part that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed" [internal quotation marks omitted]).

Indeed, the legislative history of the statute indicates that the legislature was aware that the retirement of municipal police officers is governed by contract and that it had no intention to override those contractual provisions by enacting the statute. During the debate on an amendment to § 7-294aa in the House of Representatives, Representative Richard O. Belden asked Representative Michael P. Lawlor whether "the existing [l]egislation . . . override[s] existing municipal contracts that were in place at [the time of enactment] . . . ?" 48 H.R. Proc., Pt. 27, 2005 Sess., p. 8208. Representative Lawlor responded: "I don't think the [l]egislation overrode any contract. To the contrary . . . I don't think the contracts contemplate exactly how, other than eligibility for pension benefits, I don't know your opportunity to resign for any particular purpose is covered in a contract.[11] I don't think there's a contractual issue here . . . ." Id., p. 8209.

Moreover, "[i]n the absence of a statutory definition, words and phrases in a particular statute are to be construed according to their common usage. . . . To ascertain that usage, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Earl B.* v. *Commissioner of Children & Families*, 288 Conn. 163, 175, 952 A.2d 32 (2008). "Resign" is defined as "to give up one's office or position . . . ." Webster's Ninth New Collegiate Dictionary. "Retire" is defined as "to withdraw from one's position or occupation: conclude one's working or professional career . . . ." Id. Thus,

---

[11] It is reasonable to conclude that Representative Lawlor's reference to "eligibility for pension benefits" was merely an acknowledgment that an officer's resignation from a police department might affect his eligibility for such benefits, not that § 7-294aa would affect eligibility in any way. 48 H.R. Proc., supra, p. 8209.

although both resignation and retirement connote separation from employment, retirement has the additional connotation of concluding or ending employment. If the legislature had intended to include both meanings in § 7-294aa, it easily could have done so.

We recognize that the legislative history of § 7-294aa suggests that the legislature intended that the statute would apply to a certain police officer who had retired in order to take a position with DynCorp. During the House debate on the amendment to § 7-294aa, Representative Lawlor was asked whether "this [l]egislation,. plus the law that was passed last year appl[ies] to the pending litigation that is currently going on in the [s]tate of Connecticut, in regards to a police officer who retired and then went off to Iraq, and came back?"[12] 48 H.R. Proc., supra, p. 8203, remarks of Representative Arthur J. O'Neill. Representative Lawlor responded that it was his opinion "that the existing [l]egislation, [§ 7-294aa], does apply to the officer involved in the actual litigation." Id. Representative Lawlor also indicated that that had been the intent when the legislature enacted the bill that was codified as § 7-294aa. Id., p. 8195.

As the trial court in the present case noted, however, Representative Lawlor also made statements suggesting that § 7-294aa would not apply to retirees. Representative Belden asked Representative Lawlor whether the statute applied "to anyone who has in fact retired?" Id., p. 8212. Representative Lawlor responded that "it would not . . . ." Id., p. 8213. Representative Belden then asked for clarification as to whether "the statute only

---

[12] Robert Nappe, a former police officer with the East Haven police department, was engaged in a dispute with the East Haven board of police commissioners over the application of § 7-294aa to his situation in 2004 and 2005, and the parties agree that the legislators were referring to that matter during the House debate. See generally *Nappe* v. *Board of Police Commissioners*, Superior Court, judicial district of New Haven, Docket No. CV05-4008609 (April 16, 2007).

applies to employed police officers who either take a leave of absence, or resign." Id., p. 8214. Representative Lawlor responded, "That's correct . . . ." Id.

In light of these conflicting statements about the application of § 7-294aa to retired police officers and Representative Lawlor's statement that the statute was not intended to override any existing contracts, we cannot conclude that the legislators' off-hand references to Robert Nappe's retirement; see footnote 12 of this opinion; constitute a clear indication that § 7-294aa was intended to apply to retired police officers. We conclude, therefore, that the trial court properly determined that the plaintiff did not come within the scope of § 7-294aa because he was retired.

## II

We next address the plaintiff's claim that the trial court improperly determined that the union had not made negligent misrepresentations to him. Specifically, the plaintiff claims that the trial court improperly determined that: (1) Brown had not negligently misrepresented that § 7-294aa applied to the plaintiff and that he would be reinstated in the Bristol police department when he returned from Iraq; and (2) Gallup and Brown had not negligently misrepresented that the union would represent the plaintiff while he was in Iraq and after he returned to Connecticut. We disagree.

"This court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. . . . The governing principles [of negligent misrepresentation] are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused

to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *Kramer* v. *Petisi*, 285 Conn. 674, 681, 940 A.2d 800 (2008).

To the extent that the plaintiff challenges the trial court's factual findings with respect to his claim of negligent misrepresentation, we will uphold those findings unless they are clearly erroneous. See *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 556, 767 A.2d 1169 (2001). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 221, 919 A.2d 421 (2007). "[When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 514, 903 A.2d 169 (2006).

We first address the plaintiff's claim concerning Brown's alleged statement that § 7-294aa applied to the plaintiff. The trial court found that "[t]he testimony of both the plaintiff and Brown shows that Brown merely offered an opinion that the statute applied to the plaintiff's situation, and Brown told the plaintiff that he thought he had a good argument for getting his job back, but it was likely he would have a fight on his hands." The court concluded that this was a statement

of opinion and did not constitute negligent misrepresentation.

We conclude that the evidence amply supports these factual findings. The plaintiff testified that Brown had told him that "it was his opinion that [§ 7-294aa] applied to [him] . . . ." The plaintiff further testified that he had asked Brown what would happen "when I return from Iraq and the city denies me?" Brown testified that, during his first conversation with the plaintiff regarding his rights under § 7-294aa, he had been "concerned that there was no guarantee that [the plaintiff] would be able to come back to his job, and [he] wanted [the plaintiff] to be aware of that." Brown also testified that he and the plaintiff had "discussed the likelihood that the city was not going to take him back," and that he had told the plaintiff that he might have to file a lawsuit to seek reinstatement. In addition, Brown's November 5, 2004 letter to Ferguson, a copy of which was sent to the plaintiff, stated that, if the city agreed to hold the plaintiff's sick leave payout in escrow, the union would "not consider such a position to be a waiver of any claims the [c]ity may make to the inapplicability of [§ 7-294aa]." It is clear, therefore, that the plaintiff was aware that Brown knew that it was possible that the city would take that position.

We further conclude that, because the trial court reasonably found that Brown merely was expressing his opinion about the possibility of the plaintiff's reinstatement, the trial court properly determined, as a matter of law, that Brown's statements did not constitute negligent misrepresentation. Accordingly, we reject this claim.

Finally, we turn to the plaintiff's claim regarding the union's alleged negligent misrepresentation that it would represent the plaintiff in connection with his claim that he was entitled to be reinstated as a police

officer under § 7-294aa. The trial court noted that, "[w]hile the plaintiff testified that Gallup told him that the union would represent him, Gallup denied this. Both the plaintiff and Brown testified that Brown told him that the union probably would represent him, but he could not guarantee it." The trial court also found that "[t]he plaintiff admitted that he had pretty much decided to go to Iraq when he learned of the public act. He also admitted that he would have gone even if Brown stated that union representation would be limited to enforcement of the collective bargaining agreement, and the plaintiff did leave for Iraq despite Brown's statement that he could not guarantee union representation." The court concluded that the plaintiff had not proved that the union misrepresented facts or that he had relied, to his detriment, on any misrepresentation.

Again, we conclude that the evidence amply supports the trial court's determination. Although the court did not indicate whether it credited Gallup's testimony or the plaintiff's testimony concerning the statements that Gallup made, the record reveals that the plaintiff testified that Brown had told him that he could not guarantee that the union would represent him, but that it probably would, and that Brown testified that he told the plaintiff that he did not know if the union would represent him in connection with a lawsuit to seek reinstatement, but that Brown personally would not. On the basis of this evidence, the trial court reasonably could have found that the plaintiff knew, before he submitted his letter of resignation, that there was some risk that the union would not represent him in connection with his efforts to be reinstated under § 7-294aa. There is no evidence that the plaintiff disbelieved Brown or made any attempt to reconcile his statement with Gallup's allegedly conflicting statement before he resigned and requested his retirement benefits.[13] Accordingly, we

[13] We therefore need not consider whether the evidence supported the trial court's finding that the plaintiff would have separated from his employ-

conclude that the trial court properly determined that the union made no misrepresentation of fact on which the plaintiff justifiably relied to his detriment.

The judgment is affirmed.

In this opinion the other justices concurred.

ment with the police department even if Brown had stated unequivocally that the union would not represent him in connection with his efforts to be reinstated.