# DIRECTOR OF HEALTH AFFAIRS POLICY PLANNING, UNIVERSITY OF CONNECTICUT HEALTH CENTER *v.* FREEDOM OF INFORMATION COMMISSION
## (SC 18286)

Norcott, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued March 24—officially released August 25, 2009

*Tracie C. Brown,* principal attorney, with whom, on the brief, were *Victor Perpetua,* principal attorney, and *Colleen Murphy,* general counsel, for the appellant (defendant).

*Jane D. Comerford,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (plaintiff).

*Opinion*

McLACHLAN, J. The dispositive issue in this appeal is whether certain records held by the plaintiff, the director of health affairs policy planning for the University of Connecticut Health Center,[1] are exempt from disclosure under the freedom of information act (act), General Statutes § 1-200 et seq., pursuant to General Statutes § 19a-17b (d), which protects peer review proceedings from discovery and introduction into evidence in a civil action.[2] The defendant, the freedom of information commission (commission), appeals from the judgment of the trial court sustaining the plaintiff's appeal

[1] At various points in the proceedings underlying this appeal, both the director of health affairs policy planning and the University of Connecticut Health Center were identified as the plaintiff. For convenience, we refer to both as the plaintiff in this opinion.

[2] General Statutes § 19a-17b (d) provides in relevant part: "The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings . . . ."

from the final decision of the commission.[3] On appeal, the commission claims that the trial court improperly concluded that the requested records were exempt from disclosure pursuant to § 19a-17b. The commission also claims that the trial court improperly concluded that four of the requested records were exempt from disclosure pursuant to § 60.13 (a) of title 45 of the Code of Federal Regulations.[4] Because we conclude that § 19a-17b is inapplicable to commission proceedings, and, therefore, that 45 C.F.R. § 60.13 is also inapplicable, we reverse the judgment of the trial court.

The final decision of the commission sets forth the following relevant facts and procedure. The complainant, Louis J. Russo, a former patient of Jacob Zamstein, a physician, requested in writing records pertaining to the plaintiff's decision not to renew Zamstein's clinical privileges. In response, the plaintiff produced minutes of four meetings of the clinical affairs subcommittee of the University of Connecticut Health Center board of directors, but declined to produce the remainder of the requested records, which the plaintiff claimed comprised the credentialing file created by the clinical affairs subcommittee and the credentials committee. The complainant then filed a complaint with the commission seeking disclosure of the records pursuant to the act. Following a hearing on the matter, the commis-

---

[3] The commission appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] Section 60.13 (a) of title 45 of the Code of Federal Regulations provides: "Limitations on disclosure. Information reported to the [National Practitioner] Data Bank is considered confidential and shall not be disclosed outside the Department of Health and Human Services, except as specified in § 60.10, § 60.11 and § 60.14. Persons and entities which receive information from the [National Practitioner] Data Bank either directly or from another party must use it solely with respect to the purpose for which it was provided. Nothing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable [s]tate law to make such disclosure."

sion concluded that the plaintiff is a public agency within the meaning of § 1-200 (1) (A); the requested records are public records within the meaning of General Statutes §§ 1-210 (a) and 1-212 (a);[5] the clinical affairs subcommittee and the credentials committee are medical review committees within the meaning of § 19a-17b (a) (4); and the requested records concern peer review.[6] The commission also concluded, however, that § 19a-17b (d) is applicable only to "civil actions" and not to proceedings before the commission seeking disclosure pursuant to the act. Therefore, the commission concluded that § 19a-17b (d) does not provide an exemption to mandatory disclosure pursuant to §§ 1-210 (a) and 1-212 (a). The commission also rejected the plaintiff's claim that four of the requested records—labeled IC-2006-098-20 through IC-2006-098-23 and IC-2006-098-33—were exempt from disclosure pursuant to 45 C.F.R. § 60.13 (a). In rejecting the plaintiff's claim, the commission relied on the last sentence of 45 C.F.R. § 60.13 (a), which provides: "Nothing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable [s]tate law to make such disclosure." Reasoning that the act authorized the plaintiff to make the disclosure, the commission concluded that 45 C.F.R. § 60.13 (a) did not provide

---

[5] General Statutes § 1-210 (a) provides in relevant part: "Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. . . ."

General Statutes § 1-212 (a) provides in relevant part: "Any person applying in writing shall receive, promptly upon request, a plain or certified copy of any public record. . . ."

[6] The commission based its finding that the requested records concern peer review on its in camera review of the forty-two records produced by the plaintiff upon the commission's order.

an exemption to the act.[7] Accordingly, the commission ordered the plaintiff to provide the complainant with copies of the requested records, with the exception of three records that the commission had determined were exempt from disclosure under § 1-210 (b) (10) because those records constituted requests for legal advice and responses thereto.

The plaintiff appealed from the decision of the commission to the trial court, which sustained the appeal, concluding that § 19a-17b (d) constituted an exemption to disclosure under the act. In its analysis, the trial court relied heavily on the public policy reasons underlying the peer review privilege,[8] namely, "to encourage frank, uninhibited discussion, debate and criticism by the peers of a health care provider" during peer review proceedings, and, by encouraging that level of candor, to improve the quality of patient care. *Commissioner of Health Services* v. *Kadish*, 17 Conn. App. 577, 582, 554 A.2d 1097 (*O'Connell, J.*, dissenting), cert. denied, 212 Conn. 806, 563 A.2d 1355 (1989). That purpose, according to the trial court, would be undermined by the disclosure of the records to the complainant. The court also focused on the provision in § 19a-17b (d) that peer review material " 'shall not be subject to discovery,' " and concluded that allowing discovery of such material in the context of the act would have a

---

[7] The plaintiff did not challenge on appeal the following rulings of the commission: (1) the commission had not been deprived of jurisdiction over the complaint by virtue of the complainant's repeated, earlier requests to the plaintiff for the records; (2) the records were not exempt from disclosure pursuant to § 1-210 (b) (2) on the ground that they were "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy"; and (3) the records were not exempt from disclosure pursuant to § 1-210 (b) (1) on the ground that they constituted "[p]reliminary drafts or notes . . . ."

[8] Although § 19a-17b does not include the phrase "peer review privilege," our case law uses that term in referring to the exemptions provided by § 19a-17b. See, e.g., *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 825, 742 A.2d 322 (1999).

chilling effect on the peer review process. Finally, the court concluded that proceedings of the commission pursuant to the act constitute civil actions for purposes of § 19a-17b (d). The court based its conclusion on the fact that proceedings pursuant to the act are instituted by the filing of a complaint; the commission is authorized to conduct hearings and hear testimony; and the proceedings are governed by various "procedural formalities commonly associated with an action in court." The trial court also concluded that the four records determined by the commission to pertain to information from the national practitioner data bank (data bank) were exempt from disclosure. The trial court reasoned that the information from the data bank was provided solely for the purpose of peer review, and that disclosure to the complainant would violate the requirement of 45 C.F.R. § 60.13 (a) that entities that receive information from the data bank must "use it solely with respect to the purpose for which it was provided." Accordingly, the court rendered judgment sustaining the plaintiff's appeal. This appeal followed.

The plaintiff claims that § 19a-17b (d) provides a statutory exemption to mandatory disclosure under the act. The commission contends that § 19a-17b (d) is inapplicable to the act because proceedings pursuant to the act do not constitute civil actions within the meaning of § 19a-17b (d). We agree with the commission.

Section 19a-17b (d) provides in relevant part: "The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings . . . ." In order to interpret this language to

mean that the peer review privilege bars disclosure pursuant to the act, we would have to conclude that the legislature intended the phrase "shall not be subject to discovery . . . in any civil action," to include in its meaning "shall not be subject to *disclosure . . . in any action before the commission.*" This presents two closely related questions: whether the legislature, in enacting § 19a-17b (d), intended for the term "discovery" to include disclosure pursuant to the act, and intended for the phrase "in any civil action" to include actions before the commission. Both of these are questions of statutory construction and therefore are subject to plenary review. *Barton* v. *Bristol*, 291 Conn. 84, 97, 967 A.2d 482 (2009). "General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 97–98. We interpret the words of the statute "according to their ordinary meaning unless their context dictates otherwise." (Internal quotation marks omitted.) *State* v. *Mattioli*, 210 Conn. 573, 576, 556 A.2d 584 (1989).

We address each of these questions of statutory interpretation in turn, beginning with the question of whether "discovery" properly may be understood to include disclosure under the act, and taking our starting point, as § 1-2z directs, with the text of the statute. In enacting § 19a-17b (d), the legislature defined its scope in terms of rendering the proceedings of a medical review committee "not . . . subject to discovery or introduction into evidence . . . ."[9] The meaning of

---

[9] In *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 821–22, 742 A.2d 322 (1999), we explained that the privilege does not shield all documents used in peer review proceedings. Rather, "the privilege applies only to those documents that reflect the proceedings of a peer review, or that were created primarily for the purpose of being utilized during the course of peer review.

"discovery" must be understood as it is employed in the statute, as one of the *two* circumstances within a civil action in which the privilege comes into play—in other words, "discovery" is best understood in conjunction with the concept of "evidence." Reading these two terms together, the most reasonable understanding of their meaning is that "discovery" refers to the pretrial procedures by which parties attempt to gain access to information held by the opposing party,[10] and "introduction into evidence" refers to the means by which the parties attempt to use the information that they have available to them at the time of trial. This understanding of discovery is consistent with its dictionary definition as including "[t]he pre-trial devices that can be used by one party to obtain facts and information about the case from the other party in order to assist the party's preparation for trial." Black's Law Dictionary (6th Ed. 1990). In other words, discovery is a tool by which a party may *acquire* information, which the party then may *use* at trial if the information is admissible as evidence.

In contrast, the concept of "disclosure" is related to "[t]he overarching legislative policy of the [act]" which favors "the open conduct of government and free public access to government records." (Internal quotation marks omitted.) *Perkins* v. *Freedom of Information*

---

. . . [T]he privilege does not apply to those documents that were independently recorded or acquired." (Internal quotation marks omitted.) Id., 822. In other words, the privilege applies "to the substantive discourse that takes place at the actual meetings during which 'matters which are subject to evaluation and review by such committee,' are discussed and deliberated." Id.

[10] The rules of practice allow for discovery in "any civil action . . . probate appeal, or . . . administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required . . . ." Practice Book § 13-2. Some of the available tools of discovery include interrogatories; see Practice Book § 13-6; production requests; see Practice Book § 13-9; depositions; see Practice Book § 13-26; and subpoenas. See General Statutes § 52-143 (subpoenas).

*Commission,* 228 Conn. 158, 166, 635 A.2d 783 (1993). We have recognized that "the act does not confer upon the public an absolute right to all government information." *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 328, 435 A.2d 353 (1980). Instead, the act represents "a legislative intention to balance the public's right to know what its agencies are doing, with the governmental and private needs for confidentiality. . . . The general rule, under the act, however, is disclosure." Id., 328–29. The concrete form that disclosure takes is set forth in § 1-210 (a), which provides in relevant part: "Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. . . ." See also General Statutes § 1-211 (disclosure of computer-stored public records).

Certainly, disclosure under the act and discovery share an essential characteristic—both are designed to obtain information that is in the possession of another and otherwise may be unavailable to the seeker. We have concluded, however, that the rules of discovery and the provisions of the act operate "separately and independently" of each other. *Chief of Police* v. *Freedom of Information Commission,* 252 Conn. 377, 396, 746 A.2d 1264 (2000). In *Chief of Police,* we addressed the "scope of General Statutes § 1-213 (b), which provides in relevant part: 'Nothing in the . . . [a]ct shall be deemed in any manner to: (1) . . . limit the rights of litigants, including parties to administrative proceedings, under the laws of discovery of this state . . . .' " Id., 379. In that case, the plaintiff, the chief of police

of the Hartford police department, claimed that certain requested records were exempt from disclosure under the act because the,same records were the subject of a discovery request in a pending federal action. Id., 380, 383. We rejected the plaintiff's argument, concluding that "each determination—disclosure under the act, and disclosure under discovery rules—is made solely by the body charged with that responsibility: the [commission] or the court applying the act; and the court applying its discovery rules." Id., 397. We expressly acknowledged that "the practical effect of our interpretation is that a member of the public might be able to secure under the act documents from an agency that he is suing or intends to sue that he might not be able to secure through discovery in the litigation." Id. We noted, however, that "the act and judicial discovery rules are designed with different aims and limitations in mind." Id. For that reason, "[t]he fact that a member of the public might also be an adversary of the agency . . . does not by itself strip him of his rights under the act." Id. Our decision in *Chief of Police* supports our initial reading of the term "discovery" in § 19a-17b (d) as being confined to discovery in a court action in a civil matter. Our conclusion in *Chief of Police* that the rules of discovery and the provisions of the act operate separately and independently is irreconcilable with the notion that the term "discovery" in § 19a-17b (d) may be interpreted to include disclosure pursuant to the act.

Moreover, the phrase "civil action" in § 19a-17b (d) must be understood in relation to the other terms in the statute. Our conclusion that "discovery" as used in § 19a-17b (d) refers solely to discovery in the context of a court action in a civil matter makes it unlikely that the phrase "civil action" reasonably may be interpreted to include proceedings before the commission. Also, just as our understanding of "discovery" is informed by the use of that term in conjunction with the phrase

"introduction into evidence" in § 19a-17b (d), so is our understanding of the phrase "civil action." That is, § 19a-17b (d) defines the scope of the privilege as exempting peer review proceedings from being "subject to discovery or introduction into evidence in any civil action . . . ." As we already have noted, the use of the terms "discovery" and "introduction into evidence," together with the term "civil action" signify that the legislature intended that the privilege apply within the context of a court action in a civil matter.

This interpretation is supported both by our case law interpreting the statutory definition of civil action in title 52 of the General Statutes, and by the statutory language employed by the legislature in defining the scope of other privileges to extend both to civil actions and proceedings before administrative agencies. Although there is no definition of "civil action" in § 19a-17b, it is defined in title 52 of the General Statutes, which governs civil actions. Specifically, General Statutes § 52-91 provides in relevant part that "[t]here shall be one form of civil action. The first pleading on the part of the plaintiff shall be known as the complaint and shall contain a statement of the facts constituting the cause of action and, on a separate page of the complaint, a demand for the relief, which shall be a statement of the remedy or remedies sought." Additionally, General Statutes § 52-45a sets forth the procedures governing the commencement of a civil action: "Civil actions shall be commenced by legal process consisting of a writ of summons or attachment, describing the parties, the court to which it is returnable, the return day, the date and place for the filing of an appearance and information required by the Office of the Chief Court Administrator. The writ shall be accompanied by the plaintiff's complaint. The writ may run into any judicial district and shall be signed by a commissioner of the Superior Court or a judge or clerk of the court

to which it is returnable." In applying §§ 52-91 and 52-45a to determine whether a statutory proceeding constitutes a civil action, we have considered whether the action was commenced by the filing of a complaint, as well as whether it was commenced by service of process or controlled by rules of pleading. *Board of Education* v. *Tavares Pediatric Center*, 276 Conn. 544, 558, 888 A.2d 65 (2006) (Rhode Island administrative proceeding not civil action); see also *Waterbury* v. *Waterbury Police Union*, 176 Conn. 401, 407–408, 407 A.2d 1013 (1979) (statutory proceeding to confirm, modify or vacate arbitration award not civil action because not initiated by filing complaint); *Chieppo* v. *Robert E. McMichael, Inc.*, 169 Conn. 646, 652, 363 A.2d 1085 (1975) (appeal from finding and award of workers' compensation commissioner not civil action); *Slattery* v. *Woodin*, 90 Conn. 48, 50, 96 A. 178 (1915) (appeals from probate not civil actions).

Moreover, we have never concluded that a proceeding before an administrative agency necessarily is a civil action. Although the question of whether such a proceeding could under *no* circumstances constitute a civil action is not before us today—and we expressly do not decide that issue—we note that administrative appeals, which are heard in the first instance in the Superior Court, are deemed to be civil actions only under *some* circumstances. See Practice Book § 14-6 (administrative appeals civil actions for purposes of rules of practice, but not for purposes of certain enumerated statutes);[11] see also *Commissioner of Health*

---

[11] Practice Book § 14-6 provides: "For purposes of these rules, administrative appeals are civil actions. Whenever these rules refer to civil actions, actions, civil causes, causes or cases, the reference shall include administrative appeals except that: (a) appeals from judgments of the superior court in administrative appeals shall be by certification only as provided by General Statutes § 51-197b as amended, and by chapter 72 of these rules; and (b) an administrative appeal shall not be deemed an action for purposes of General Statutes §§ 52-591, 52-592 or 52-593."

*Services* v. *Kadish*, supra, 17 Conn. App. 580–81 (investigation by commissioner of health services was purely administrative investigatory proceeding, not proceeding in court, and thus not civil action for purposes of § 19a-17b [then codified at General Statutes § 38-19a]). Certainly, then, the underlying proceeding before an administrative agency—rather than a court—may be deemed a civil action only if the evidence of such legislative intent is strong. That evidence is lacking in the present case.

Proceedings pursuant to the act are not commenced by service of process, but by filing a notice of appeal pursuant to General Statutes § 1-206 (b) (1), which provides in relevant part that "[a]ny person denied the right to inspect or copy records under [§] 1-210 . . . may appeal therefrom to the Freedom of Information Commission, by filing a notice of appeal with said commission. . . ." Although appeals to the commission often are referred to as complaints, the regulations adopted by the commission define " '[c]omplaint' " as "an appeal to the commission under [§ 1-206] of the general statutes." Regs., Conn. State Agencies § 1-21j-1 (b) (4). The commission, upon receipt of the notice of appeal, then "shall serve upon all parties, by certified or registered mail, a copy of such notice together with any other notice or order of such commission." General Statutes § 1-206 (b) (1). Moreover, actions before the commission are not governed by the rules of pleading. Certainly, proceedings before the commission are governed by formal rules of procedure. See Regs., Conn. State Agencies § 1-21j-1 et seq. Procedural formality alone, however, does not convert an administrative proceeding conducted by an agency of the executive branch into a civil action conducted in a court of law. Any superficial similarities between the procedural rules governing proceedings before the commission and court actions in a civil case cannot overcome the obvious difference

that the two proceedings take place within two distinct and separate branches of government.

Reference to other privilege statutes confirms that the legislature did not intend to use the phrase "civil action" to include proceedings before the commission. Virtually all of the privilege statutes list civil actions and administrative proceedings as separate contexts in which the privilege applies. An illustrative example appears in the very same chapter as § 19a-17b. General Statutes § 19a-25 provides that the information procured by the department of public health "for the purpose of reducing the morbidity or mortality from any cause or condition, shall be confidential and shall be used solely for the purposes of medical or scientific research . . . ." Section 19a-25 specifies that "[s]uch information . . . shall not be admissible as evidence in *any action of any kind* in any court or *before any other* tribunal, board, *agency* or person, nor shall it be exhibited or its contents disclosed in any way, in whole or in part, by any officer or representative of the [d]epartment of [p]ublic [h]ealth or of any such facility, by any person participating in such a research project or by any other person, except as may be necessary for the purpose of furthering the research project to which it relates." (Emphasis added.) The legislature evinced a clear intent in § 19a-25 that the information at issue is not to be disclosed "in any action of any kind," and specifies actions in court and before agencies as separate contexts in which the privilege applies. See also General Statutes § 52-146b (communications made to clergymen not disclosable absent waiver "in any civil or criminal case or proceedings preliminary thereto, or in any legislative or administrative proceeding"); General Statutes § 52-146c (b) (communications between psychologist and patient privileged absent waiver "in civil and criminal actions, in juvenile, probate, commitment and arbitration proceedings, in proceedings pre-

liminary to such actions or proceedings, and in legislative and administrative proceedings"); General Statutes § 52-146k (b) (confidential communications between battered women's counselor or sexual assault counselor and victim not disclosable absent waiver "in any civil or criminal case or proceeding or in any legislative or administrative proceeding"); General Statutes § 52-146n (b) (communications between judicial branch employee and employee assistance program counselor not disclosable absent waiver "in any civil or criminal case or proceeding or in any legislative or administrative proceeding"); General Statutes § 52-146o (a) (physician or surgeon may not disclose patient communications or information obtained by personal examination of patient, absent consent, "in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding"). It is difficult to reconcile the legislature's practice, in the case of all of these privileges, of specifying separately that the privilege extends both in the context of civil actions and administrative proceedings, with the proposition that "civil action" as used in § 19a-17b encompasses both court actions and proceedings before the commission.[12]

When the legislature has not enumerated the specific contexts in which a privilege applies, it has in other ways defined the scope of the privilege to preclude disclosure under the act. For example, the legislature has extended certain privileges both to civil actions and to administrative proceedings by defining the privilege in very broad terms stating that the subject information

---

[12] Interpreting "civil action" to include proceedings before the commission would not necessarily extend the privilege to other administrative proceedings before other administrative agencies, or proceedings before other tribunals or boards, thus undercutting one of the primary arguments in favor of interpreting "civil action" so broadly—namely, that the broad interpretation would effect the public policy underlying the peer review privilege, that is, the prevention of *any* public disclosure of peer review proceedings.

is "confidential" generally. See, e.g., General Statutes § 51-51*l* (governing investigations by judicial review council of judge, compensation commissioner or family support magistrate, and providing that "[a]ny investigation to determine whether or not there is probable cause that conduct under [General Statutes §] 51-51i has occurred shall be confidential and any individual called by the council for the purpose of providing information shall not disclose his knowledge of such investigation to a third party prior to the decision of the council on whether probable cause exists, unless the respondent requests that such investigation and disclosure be open"). Such a blanket statement of confidentiality covers any and all venues. Yet another approach the legislature has taken in other contexts is to incorporate a privilege expressly in the act, such as the attorney-client privilege. See, e.g., General Statutes § 1-210 (b) ("nothing in the [act] shall be construed to require disclosure of . . . [10] . . . communications privileged by the attorney-client relationship"). The legislature could have, but did not, similarly broadened the scope of the peer review privilege by expanding its applicability beyond the context of civil actions, either by providing a blanket protection of general confidentiality, or by expressly incorporating the privilege into the act.

We conclude, on the basis of the foregoing, that the term "civil action" as used in § 19a-17b (d) plainly and unambiguously does not include proceedings before the commission. See General Statutes § 1-2z. Section 19a-17b (d) prevents the proceedings of a medical review committee engaged in the process of peer review from being subject to discovery or introduction into evidence in a civil action, but does not bar the disclosure of such information pursuant to the act. Therefore, because it is undisputed that the plaintiff is a public agency subject to the mandatory disclosure requirement of the act; see General Statutes §§ 1-210 (a) and 1-212 (a); and that the requested records are public

records under the act, the commission properly ordered disclosure of the requested records, with the exception of those that fell under an applicable exemption.[13]

We do not reach this conclusion lightly. We, like the dissent, are mindful of the significant public policy purpose underlying the peer review privilege, namely, to promote public health and safety by encouraging "committee members to take positions that they might not otherwise take if they thought they were going to be subpoenaed in the middle of a malpractice case." (Internal quotation marks omitted.) *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 825, 742 A.2d 322 (1999). The privilege is grounded on the belief that "physicians . . . would not feel free to openly discuss the performance of other doctors practicing in the hospital, without assurance that their discussions in committee would be confidential and privileged . . . ." (Internal quotation marks omitted.) Id. Thus, preventing a malpractice litigant from acquiring, in a civil action, peer review records through discovery and use of those records by introducing them into evidence furthers this purpose by protecting participants in the peer review process from being hauled into court to testify regarding the peer review records or proceedings.[14]

---

[13] Because we conclude that disclosure of the requested records was required under the act, we further conclude that 45 C.F.R. § 60.13 (a) does not bar disclosure of the four records that the plaintiff asserts were obtained from the data bank. That provision specifically provides: "Nothing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable [s]tate law to make such disclosure." 45 C.F.R. § 60.13 (a); see footnote 4 of this opinion. The act not only authorizes the plaintiff to make the disclosure; it makes such disclosure *mandatory*. Section 60.13 (a), therefore, is inapplicable.

[14] A separate provision in § 19a-17b protects participants in the peer review proceedings from defamation actions. Section 19a-17b (c) provides: "There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any member of a medical review committee for any act or proceeding undertaken or performed within the scope of any such committee's functions provided that such member has taken action or made recommendations without malice and in the reasonable belief that the act or recommendation was warranted."

We recognize the possibility that the purpose of the peer review privilege may be undermined by allowing disclosure under the act of peer review proceedings. As the plaintiff contends, the cat, so to speak, is "out of the bag" once disclosure is permitted. *Commissioner of Health Services* v. *Kadish*, supra, 17 Conn. App. 585 (*O'Connell, J.*, dissenting). It is therefore possible that disclosure under the act may have the same chilling effect that the legislature sought to avoid by enacting § 19a-17b. That possibility, however, cannot convert "discovery" to "disclosure"; nor can it make the administrative proceeding at issue in the present case a civil action. Indeed, extending the definition of the term "civil action" to include proceedings before the commission would, in our opinion, be a greater evil than interpreting the law as written even though we acknowledge that the public policy of § 19a-17b is not being served. We do not believe that in interpreting the law, we have authority to rewrite it. It is possible that, in drafting § 19a-17b, the legislature did not foresee that certain peer review proceedings might become the subject of a freedom of information request because the vast majority of hospitals are not public agencies and are not, therefore, subject to the provisions of the act. We emphasize, however, that records that are subject to disclosure under the act are not subject to discovery or introduction into evidence in a civil action for or against a health care provider, if those records constitute peer review material and not "documents that were independently 'recorded' or 'acquired.' " *Babcock* v. *Bridgeport Hospital*, supra, 251 Conn. 822. Thus, although a malpractice litigant may succeed under the act in obtaining disclosure of records that are exempt from discovery, the privilege nevertheless prevents the use of such records in a civil action. Furthermore, pursuant to § 19a-17b (d), "no person who was in attendance at a meeting of such committee shall be permitted

or required to testify in any such civil action as to the content of such proceedings . . . ." In any case, the task of changing the law lies with the legislature, and not with the judiciary. "In construing a statute, the cardinal principle of construction is to ascertain the intent of the legislature. If an act passed by the legislature is within its constitutional power, it is not the business of the court to attempt to twist the interpretation of the law to conform to the ideas of the judges as to what the law ought to be or to attempt to make the law coincide with their ideas of social justice. The judicial function should not invade the province of the legislature." *Tileston* v. *Ullman*, 129 Conn. 84, 97, 26 A.2d 582 (1942) (*Avery, J.,* dissenting).

The judgment is reversed and the case is remanded to the trial court with direction to dismiss the plaintiff's appeal.

In this opinion PALMER, VERTEFEUILLE and ZARELLA, Js., concurred.

NORCOTT, J., dissenting. I respectfully disagree with the majority's conclusion that General Statutes § 19a-17b (d) is inapplicable in proceedings before the freedom of information commission (commission) and, therefore, that certain records held by the plaintiff, the director of health affairs policy planning for the University of Connecticut Health Center, are not exempt from disclosure under the freedom of information act (act), General Statutes § 1-200 et seq. In my view, the majority's narrow interpretation of the ambiguous language of § 19a-17b (d) effectively reads the "shall not be subject to discovery" language out of the statute and will have a chilling effect on future peer review proceedings, thereby defeating the very purpose of the statute. Accordingly, I respectfully dissent.

Section 19a-17b (d) provides in relevant part: "The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings . . . ." The majority properly focuses its analysis on the terms "discovery" and "civil action," and concludes that their plain meaning indicates that the legislature intended for the protections afforded by § 19a-17b (d) to apply only to the formal discovery process, namely, the pretrial tools used by one party to obtain information in preparation for trial, in a court action in a civil matter. In my view, however, the meaning of those terms is ambiguous, and when the clear purpose of the peer review statute is considered, I conclude that the legislature intended § 19a-17b (d) also to preclude the disclosure of peer review proceedings in an action before the commission.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in

context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Hees* v. *Burke Construction, Inc.*, 290 Conn. 1, 10, 961 A.2d 373 (2009).

It is well settled that, "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . . General Statutes § 1-1 (a). We ordinarily look to the dictionary definition of a word to ascertain its commonly approved usage." (Internal quotation marks omitted.) *State* v. *Gelormino*, 291 Conn. 373, 380, 968 A.2d 379 (2009). With respect to the term "discovery," the majority concludes that, when read in conjunction with the statute's prohibition on "introduction into evidence," that term was intended to refer to its dictionary definition, under the heading "[t]rial practice," as "[t]he pre-trial devices that can be used by one party to obtain facts and information about the case from the other party in order to assist the party's preparation for trial." Black's Law Dictionary (6th Ed. 1990). A subsequent edition of that same dictionary, however, also defines the term "discovery" as, in relevant part, "[t]he act or process of finding or learning something that was previously unknown"; Black's Law Dictionary (7th Ed. 1999); a definition that is virtually identical to that for the term "disclosure" which, as the majority notes, typically is associated with proceedings under the act. See id. (defining "disclosure" as, in relevant part, "[t]he act or process of making known something that was previously unknown"). In my view, each of these readings of the term "discovery" is perfectly reasonable in the context of § 19a-17b and, accordingly, I conclude that the legislature's use of that term is, at the very least, ambiguous.[1] See, e.g., *Hees* v. *Burke Construction, Inc.*, supra, 290 Conn. 10.

---

[1] In concluding that the term "discovery" refers only to the pretrial process of obtaining information for subsequent use at trial, the majority states: "The meaning of 'discovery' must be understood as it is employed in the

The meaning of "civil action" similarly is unclear based on the language of § 19a-17b, which does not define that term for the purposes of disclosure of peer review proceedings. Black's Law Dictionary (7th Ed. 1999), however, defines the term broadly as "[a]n action brought to enforce, redress, or protect a private or civil right; a noncriminal litigation." That definition does not specify that the action must be a court proceeding in order to be classified as a civil action, and there is no clear indication, either in the statutes or in our case law, that that is the case.[2] Accordingly, I conclude that

statute, as one of the *two* circumstances within a civil action in which the privilege comes into play—in other words, 'discovery' is best understood in conjunction with the concept of 'evidence.' " (Emphasis in original.) In my view, however, it does not follow from the fact that the legislature deemed peer review proceedings to be inadmissible evidence, that it intended the term "discovery" to apply only in the limited evidentiary sense of the term. If the legislature's intent in enacting § 19a-17b simply was to prevent peer review proceedings from being introduced into evidence at trial, then its use of the term "discovery," understood exclusively as a pretrial device designed to achieve that ultimate goal, essentially would be redundant because such concerns likely would be adequately addressed by the statute's explicit prohibition on "introduction into evidence . . . ." General Statutes § 19a-17b (d). Thus, it is reasonable to interpret the legislature's use of the term "discovery" as an indication that it had more than mere evidentiary concerns in mind, and that it intended more broadly to prevent the release, or "disclosure," of such information regardless of whether it was sought for a specific evidentiary purpose. Put differently, the legislature's inclusion of the term "discovery," *in addition to* the prohibition on "introduction into evidence," indicates that a third party's mere knowledge of such information was something that the legislature sought to avoid, a view that accords with the disclosure oriented definition of the word "discovery."

[2] I acknowledge that the rules governing the commencement of a civil action are set forth in part elsewhere in the statutes; see General Statutes §§ 52-45a and 52-91; and that our cases have, as a factor in determining whether an administrative proceeding properly may be classified as a civil action, examined the procedure for commencing that proceeding to determine whether it is sufficiently similar to the requirements set forth in §§ 52-45a and 52-91. See, e.g., *Board of Education* v. *Tavares Pediatric Center*, 276 Conn. 544, 557–58, 888 A.2d 65 (2006); *Waterbury* v. *Waterbury Police Union*, 176 Conn. 401, 407, 407 A.2d 1013 (1979); *Chieppo* v. *Robert E. McMichael, Inc.*, 169 Conn. 646, 652, 363 A.2d 1085 (1975). As the majority notes, however, the process for filing an appeal before the commission *is* strikingly similar, although not identical, to the requirements set forth in

an interpretation of the term "civil action" that includes an action brought before the commission by a private individual seeking to enforce his or her right to public information under the act falls squarely within the common dictionary definition of the term, and is a reason-

§§ 52-45a and 52-91. Compare, e.g., Regs., Conn. State Agencies § 1-21j-23 (requiring complaint and other documents submitted to commission to be signed), Regs., Conn. State Agencies § 1-21j-26 (requiring complaint and other documents to be served in same manner as permitted by Superior Court), and Regs., Conn. State Agencies § 1-21j-28 (commencement of action occurs upon filing of complaint with commission, which must include complainant's name, address, and telephone and fax numbers and concise statement of relevant facts, including nature of relief sought), with General Statutes § 52-45a (commencement of civil action requires writ of summons describing parties, return date and place and date for filing appearance, accompanied by complaint), and General Statutes § 52-91 (requiring first pleading in civil action to be "complaint . . . contain[ing] a statement of the facts constituting the cause of action and . . . a demand for the relief, which shall be a statement of the remedy . . . sought").

Moreover, our prior cases have not categorically stated that such similarity is the *only* relevant factor in classifying an administrative proceeding as a civil action. To the contrary, we have recognized on several occasions that the purpose for which a statute containing a term such as "civil action" was enacted is an important factor in determining whether a proceeding falls with the scope of that term as it is used in the specific context of that particular statute. See *Connecticut Light & Power Co.* v. *Costle*, 179 Conn. 415, 423, 426 A.2d 1324 (1980) ("the scope of proceedings which will be included within a term, whose precise reach is uncertain, depends upon the nature and purpose of the particular statute in question"); *Chieppo* v. *Robert E. McMichael, Inc.*, supra, 169 Conn. 653–54 (examining purpose of statute as factor in determining whether legislature intended administrative proceeding to constitute civil action); *Carbone* v. *Zoning Board of Appeals*, 126 Conn. 602, 605, 13 A.2d 462 (1940) ("the scope of proceedings which will be included within the term as used in the statutes depends upon the nature and purpose of the particular statute in question"); *Fishman* v. *Middlesex Mutual Assurance Co.*, 4 Conn. App. 339, 344, 494 A.2d 606 ("[w]hat the legislature may have intended to be a civil action for some purposes may not be a civil action for others"), certs. denied, 197 Conn. 806, 807, 499 A.2d 57 (1985). Our prior case law, therefore, does not foreclose the possibility that the legislature intended an action before the commission to be considered a civil action in the specific context of protecting peer review proceedings from disclosure under § 19a-17b, and it is appropriate for us to examine the purpose behind § 19a-17b in order to determine if the legislature did so intend. See, e.g., *Connecticut Light & Power Co.* v. *Costle*, supra, 423–24.

able reading of the statutory language. In light of the majority's equally reasonable reading of the statute, I conclude that the term "civil action," as used in the context of § 19a-17b, also is ambiguous.

When the statutory language is ambiguous, "we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Fredette* v. *Connecticut Air National Guard*, 283 Conn. 813, 821–22, 930 A.2d 666 (2007). In doing so, "[o]ur ultimate objective . . . is to discern and effectuate the apparent intent of the legislature." (Internal quotation marks omitted.) *State* v. *Cote*, 286 Conn. 603, 614–15, 945 A.2d 412 (2008). Thus, we are bound to construe the statute in a manner that will reflect and achieve the purpose for which it was enacted; see *McGaffin* v. *Roberts*, 193 Conn. 393, 407, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); and to refrain from "interpret[ing] the statute in a way that would thwart [that] purpose." *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 412, 944 A.2d 925 (2008).

I begin, then, with a discussion of the concept of peer review, which has become an entrenched aspect of the provision of quality health care throughout the United States. Peer review proceedings "are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a sine qua non of adequate health care." *Bredice* v. *Doctors Hospital, Inc.*, 50 F.R.D. 249, 250, (D.D.C. 1970), aff'd, 479 F.2d 920 (D.C. Cir. 1973). "The purpose of [peer review] is the improvement, through self-analysis, of the efficiency of medical procedures and techniques." Id. To that end, health care facilities throughout the United States have, in some form or

another, created peer review mechanisms "with projected goals of, inter alia, continuing professional education, evaluation of the quality of patient care, renewal of privileges, complaint investigation and malpractice review." *Commissioner of Health Services* v. *Kadish*, 17 Conn. App. 577, 582, 554 A.2d 1097 (*O'Connell, J.*, dissenting), cert. denied, 212 Conn. 806, 563 A.2d 1355 (1989).

Courts and scholars consistently have recognized, however, that the efficacy of peer review is threatened by a reluctance on the part of many physicians and other health care providers to participate in that process. This reluctance generally stems from a number of factors, including "fear of exposure to liability, entanglement in malpractice litigation, [and] loss of referrals from other doctors . . . ." C. Creech, comment, "The Medical Review Committee Privilege: A Jurisdictional Survey," 67 N.C. L. Rev. 179 (1988);[3] see also *Yuma Regional Medical Center* v. *Superior Court*, 175 Ariz. 72, 75, 852 P.2d 1256 (App. 1993) ("[r]eview by one's peers within a hospital is not only time consuming, unpaid work, it is also likely to generate bad feelings and result in unpopularity" [internal quotation marks omitted]).

In an effort to address such concerns, virtually every state has adopted a peer review privilege statute. Although these statutes differ with regard to the scope of the privilege and the materials protected by it, with-

---

[3] Indeed, "[a] physician's qualifications, competence, and ethics all are called into question when a medical staff committee is requested to review his application for staff privileges, to determine the extent of his clinical privileges, or to assess the quality of his work. The nature of these activities suggests that committee participants may lose professional friends, as well as referrals, from physicians who receive unfavorable reviews. In addition, the committee members, and the hospitals as well, may be exposed to costly litigation alleging defamation, the most common claim arising from committee activities." R. Hall, "Hospital Committee Proceedings and Reports: Their Legal Status," 1 Am. J.L. & Med. 245, 254 (1975).

out exception they are founded on the strong public policy in favor of peer review proceedings, and are intended primarily to encourage and facilitate participation in such proceedings. The principal means of achieving that goal consist of immunizing participants from civil liability and precluding the materials used and the statements made in such proceedings from being introduced into evidence in a subsequent action for damages; see G. Gosfield, comment, "Medical Peer Review Protection in the Health Care Industry," 52 Temp. L.Q. 552, 553 (1979); and also by maintaining the confidentiality of such proceedings by prohibiting disclosure to the public.[4] See, e.g., *Morse* v. *Gerity*, 520 F. Sup. 470, 472 (D. Conn. 1981) ("[I]f the purpose of the statute is to encourage doctors to evaluate their peers without fear of disclosure, that purpose would be hampered by public release of any proceedings, not just those involving the patient who has sued. The danger of inhibiting candid professional peer review exists by the mere potential for disclosure. . . . The overriding importance of these review committees to the medical profession and the public requires that doctors have unfettered freedom to evaluate their peers in an atmosphere of complete confidentiality. No chilling effect can be tolerated if the committees are to function effectively."); *Cruger* v. *Love*, 599 So. 2d 111, 114–15 (Fla. 1992) ("[t]he privilege afforded to peer review committees is intended to prohibit the chilling effect of the potential public disclosure of statements made to or information prepared for and used by the [medical review] committee in carrying out its peer review function"); *HCA Health Services of Virginia, Inc.* v. *Levin*, 260 Va. 215, 221, 530 S.E.2d 417 (2000) ("The obvious

---

[4] At least one jurisdiction, foreseeing the very issue that we are presented with today, expressly has provided that peer review proceedings "shall not be subject to *discovery* pursuant to [that state's] . . . [f]reedom of [i]nformation [a]ct . . . ." (Emphasis added.) Ark. Code Ann. § 16-46-105 (a) (1) (A) (LexisNexis 2008).

legislative intent is to promote open and frank discussion during the peer review process among health care providers in furtherance of the overall goal of improvement of the health care system. If peer review information were not confidential, there would be little incentive to participate in the process.").[5]

---

[5] See also, e.g., *Bredice* v. *Doctors Hospital, Inc.*, supra, 50 F.R.D. 251 ("[t]here is an overwhelming public interest in having [peer review proceedings] held on a confidential basis so that the flow of ideas and advice can continue unimpeded"); *Tucson Medical Center, Inc.* v. *Misevch*, 113 Ariz. 34, 38, 545 P.2d 958 (1976) ("[t]he protection is justified by the overwhelming public interest in maintaining the confidentiality of the medical staff meetings so that the discussion can freely flow to further the care and treatment of patients"); *West Covina Hospital* v. *Superior Court*, 41 Cal. 3d 846, 853, 718 P.2d 119, 226 Cal. Rptr. 132 (1986) (peer review statute "expresses a legislative judgment that the public interest in medical staff candor extends beyond damages immunity and requires a degree of confidentiality"); *West Covina Hospital* v. *Superior Court*, supra, 853 ("[E]xternal access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. . . . [T]he quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality."); *Baltimore Sun Co.* v. *University of Maryland Medical System Corp.*, 321 Md. 659, 668, 584 A.2d 683 (1991) ("[A] high level of confidentiality is necessary for effective medical peer review. By protecting these records from public access in those situations covered by [the peer review statute], the legislature recognized that a system of effective medical peer review outweighs the need for complete public disclosure."); *Claypool* v. *Mladineo*, 724 So. 2d 373, 383 (Miss. 1998) ("[the] privilege is intended to prohibit the chilling effect of the potential public disclosure of statements made to or information prepared for and used by the [medical review] committee in carrying out its peer review function" [internal quotation marks omitted]); *Virmani* v. *Presbyterian Health Services Corp.*, 350 N.C. 449, 478, 515 S.E.2d 675 (1999) ("[t]he public's interest in access to . . . court proceedings, records and documents is outweighed by the compelling public interest in protecting the confidentiality of medical peer review records in order to foster effective, frank and uninhibited exchange among medical peer review committee members"); *Trinity Medical Center, Inc.* v. *Holum*, 544 N.W.2d 148, 155 (N.D. 1996) ("[P]hysicians would be unwilling to serve on quality assurance committees, and would not feel free to openly discuss the performance of other doctors practicing in the hospital, without assurance that their discussions in committee would be confidential and privileged. It was this purpose to encourage frank and open physician participation, and the resulting improvement in patient care, which underlies the privilege."); *Sanderson* v. *Frank S. Bryan, M.D., Ltd.*, 361 Pa. Super. 491, 494, 522 A.2d 1138 (1987) ("Generally, hospital peer review findings and records are protected

Although scant, the legislative history of § 19a-17b indicates that it was cast from the same mold as the peer review statutes of our sister states. See, e.g., 23 H.R. Proc., Pt. 24, 1980 Sess., p. 7096, remarks of Representative Richard Lawlor (peer review statute intended to "allow for some confidentiality in peer review proceedings with regard to any hospitals and medical facilities").[6] Indeed, we have recognized that the purpose of § 19a-17b is to facilitate peer review proceedings by protecting participants from civil liability and precluding the materials used therein from being introduced into evidence in an action for damages; see *Babcock* v. *Bridgeport Hospital*, 251 Conn. 790, 824–25, 742 A.2d 322 (1999); and also by protecting the confidentiality of such proceedings. See id., 825 ("[o]nly where . . . peer review committees . . . are assured of confidentiality [will they] feel free to enter into uninhibited discussions of their peers" [internal quotation marks omitted]); *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 326, 430 A.2d 1 (1980) ("[t]he purpose of [§ 19a-17b] is to

from public scrutiny . . . . The purpose for such protection is to encourage increased peer review activity which will result, it is hoped, in improved health care."), appeal denied, 517 Pa. 624, 538 A.2d 877 (1988); *Barnes* v. *Whittington*, 751 S.W.2d 493, 497 (Tex. 1988) (Phillips, C. J., concurring) ("The [peer review] statute reflects a legislative judgment that the overall quality of medical care will be elevated by shielding certain in-house evaluations from public disclosure. Medical professionals are more likely to come forward with information about professional incompetence and misbehavior when protected from personal liability or public disclosure.").

[6] See also 19 S. Proc., Pt. 2, 1976 Sess., p. 516, remarks of Senator Anthony Ciarlone (bill intended to give immunity to physicians serving on peer review committee); 19 H.R. Proc., Pt. 6, 1976 Sess., p. 2384, remarks of Representative Morris N. Cohen ("[T]his bill is a most necessary bill if we are to continue checking on health care delivery in our [s]tate. Peer review committees must constantly judge the services rendered by their peers. Without giving them this immunity, they would not be able to do so."); 19 H.R. Proc., Pt. 9, 1976 Sess., p. 4094, remarks of Representative James T. Healey ("opinions of the medical review committee . . . are not subject to discovery or introduction into evidence and . . . no person who is in attendance at a meeting of such committee shall be permitted or required to testify in civil actions as to any opinions of said committee").

keep peer review studies, discussions and deliberations confidential"); *Commissioner of Health Services* v. *Kadish*, supra, 17 Conn. App. 582 (*O'Connell, J.*, dissenting) ("[t]he peer review committee's proceedings are designed to be free from the chilling concern that they would become public and expose its members to the involvement of civil litigation and the glare of public attention").

In my view, the majority's narrow interpretation of the statutory language fails to reflect or effectuate the legislature's clear purpose and intent in enacting § 19a-17b. First, to the extent that § 19a-17b is intended to prevent litigants in a court action from obtaining peer review materials to assist in their preparation for trial—which I agree with the majority that, in large part, it is—the majority's interpretation of the statutory language effectively reads that protection out of the statute with respect to all public health care facilities throughout the state.[7] Specifically, although the prohibition remains on obtaining such materials through the formal discovery process, hereafter a litigant will be able to circumvent that safeguard simply by filing a request under the act for the exact same information, thereby eviscerating any protection that the discovery prohibition was intended to provide. It would be illogical and meaningless for the legislature to have enacted the discovery provision at all if it intended for a litigant against a public hospital to be able to obtain the same privileged information through disclosure under the act.[8] We are

---

[7] It is particularly troubling that only *public* health care institutions will be impacted adversely by the majority's conclusions today, as private health care institutions are not subject to the provisions of the act. Accordingly, the public institutions sit at a distinct disadvantage in comparison to their private competitors with respect to assuring the continued provision of quality health care through an effective peer review process.

[8] In my view, this court's decision in *Chief of Police* v. *Freedom of Information Commission*, 252 Conn. 377, 746 A.2d 1264 (2000), is inapposite. Although I agree with the majority that *Chief of Police* v. *Freedom of Information Commission* supports the proposition that the fact that certain information is not subject to disclosure under the rules of discovery does not

bound to avoid an interpretation of the statutory language that leads to such an unworkable result. See *Kelly* v. *New Haven,* 275 Conn. 580, 616, 881 A.2d 978 (2005) ("It is axiomatic that we construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." [Internal quotation marks omitted.]).

From a practical standpoint, moreover, having obtained such materials pursuant to the act, a litigant will be able to use what was said and done during the peer review proceedings to determine what questions to ask, and of whom to ask them, during the formal discovery process in order to discover evidence that *would be* admissible at trial, thereby essentially providing litigants with the blueprint for an effective trial strategy. See *Yuma Regional Medical Center* v. *Superior Court,* supra, 175 Ariz. 76 ("Inherent in [the] plaintiffs' ability to obtain information from another source is the knowledge on [the] plaintiffs' part that such information exists. . . . Herein lies the real benefit to [the] plaintiffs of [obtaining peer review materials that are not themselves admissible in evidence]: it informs [the] plaintiffs what the peer review participants consider to be relevant information to [the] plaintiffs' case— information of which [the] plaintiffs might be unaware."). As a consequence, public health care providers will be reluctant to participate in the peer review

necessarily mean that it also is not subject to disclosure under the act, it does not follow that the fact that certain information is not subject to disclosure under the rules of discovery means that it necessarily *is* subject to disclosure under the act. Put differently, the question presented here is whether the legislature intended § 19a-17b to prevent the disclosure of peer review proceedings in an action before the commission such that those materials are *neither* subject to disclosure under the rules of discovery *nor* subject to disclosure under the act, a question that was not raised or analyzed in *Chief of Police* v. *Freedom of Information Commission.*

process in the knowledge that what they say and do during such proceedings may, albeit indirectly, be used in an ongoing or subsequent malpractice action against themselves or one of their peers. This is precisely the result that the legislature sought to avoid when it enacted § 19a-17b.

Second, as a result of the majority's conclusions in this case, all peer review proceedings in public health care institutions potentially will be subject to disclosure beyond the litigation context. The ensuing public scrutiny of the comments made and documents submitted in such proceedings undeniably will have a chilling effect on peer review and will discourage health care providers—who risk their relationships with their peers, their reputation within the profession and the continued success of their practice through referrals—from participating in the process. Such a result defeats the clear purpose for which § 19a-17b was enacted, and we are bound to avoid such an interpretation. See *Kelly* v. *New Haven*, supra, 275 Conn. 616.

Accordingly, I conclude that the only permissible interpretation of the ambiguous language of § 19a-17b is that the legislature intended the language "shall not be subject to discovery . . . in any civil action" to include an action before the commission seeking disclosure of medical peer review information under the act. Because I would affirm the judgment of the trial court to that effect, I respectfully dissent.