******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COMMISSIONER OF PUBLIC HEALTH *v.* FREEDOM
OF INFORMATION COMMISSION ET AL.
(SC 19046)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Vertefeuille, Js.

*Argued December 12, 2013—officially released March 25, 2014*

*Rosemary M. McGovern*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellant-appellee (plaintiff).

*Jonathan R. Donnellan*, pro hac vice, with whom were *Stephen H. Yuhan*, pro hac vice, and, on the brief, *Cameron Stracher*, for the appellee-appellant (defendant Greenwich Time).

*Lisa Fein Siegel*, commission counsel, with whom, on the brief, was *Colleen M. Murphy*, general counsel, for the appellee (named defendant).

*David B. Fein*, United States attorney, *John B. Hughes*, assistant United States attorney, *Michael S. Raab*, pro hac vice, and *H. Thomas Byron III*, pro hac vice, filed a brief for the United States of America as amicus curiae.

*Opinion*

McDONALD, J. Congress created the National Practitioner Data Bank (Practitioner Data Bank) and the Healthcare Integrity and Protection Data Bank (Healthcare Data Bank) as national clearinghouses for, inter alia, information from health care entities and licensing boards regarding adverse actions taken against physicians and other licensed health care practitioners. The question we must answer in the present case is whether records received from these federal data banks by a state agency authorized to request this confidential information can be subject to disclosure under our Freedom of Information Act (act), General Statutes § 1-200 et seq.

The named defendant, the Freedom of Information Commission (commission), concluded that federal law permits disclosure of Practitioner Data Bank records if they are subject to disclosure under state law such as the act, but does not permit disclosure of Healthcare Data Bank records. The trial court dismissed the appeal of the plaintiff, the Commissioner of Public Health (department),[1] from the commission's decision ordering the department to disclose Practitioner Data Bank records to a local newspaper, the defendant Greenwich Time (newspaper). The trial court also dismissed the newspaper's appeal from the commission's decision insofar as it had denied the newspaper's request for an order to disclose the Healthcare Data Bank records. The department appealed and the newspaper cross appealed from the trial court's judgment. We conclude that a public agency may not disclose to an unauthorized person or entity any records received from either the Practitioner Data Bank or the Healthcare Data Bank, although the agency may disclose to a member of the public information originating from the agency's own files if disclosure is otherwise required under the act. Accordingly, we reverse the trial court's judgment with respect to the department's appeal.

The record reveals the following undisputed facts. In August, 2005, a married couple, proceeding as Jane Smith and John Smith, filed an action against Ben Ramaley, a Greenwich obstetrician/gynecologist from whom the couple had obtained an intrauterine insemination procedure. They alleged that DNA tests of the twin girls born as a result of that procedure proved that Ramaley had inseminated Jane Smith with the sperm of someone other than her husband. The complaint further alleged, upon information and belief, that Ramaley intentionally inseminated Jane Smith with his own sperm. Before discovery was completed, the case was settled and the records were sealed.

In January, 2007, the department, which had issued Ramaley's license to practice as a physician and surgeon in Connecticut, received notification from the Prac-

titioner Data Bank of the settlement of a malpractice action against Ramaley. See 42 U.S.C. § 11134 (c) (1) (2006). The department initiated an investigation and brought in a consultant from the American Board of Obstetrics and Gynecology, Robert J. Gfeller, to review Ramaley's conduct in connection with the case. In October, 2007, Gfeller issued a report finding gross violations of the standard of care by Ramaley, but no such violation with respect to the specific allegation that Ramaley had used his own sperm in the insemination procedure due to the absence of a DNA test that would give credible, positive evidence of that fact. Thereafter, the department and Ramaley entered into a consent order, designated as a public document, under which Ramaley did not contest the department's allegation that he had inseminated a patient with the wrong man's sperm, but also did not admit any wrongdoing or guilt. The order indicated that Ramaley no longer performed intrauterine insemination and that he had agreed to a reprimand on his license and a civil penalty of $10,000.

The newspaper learned of the department's response to the allegations against Ramaley, and in November, 2009, it sent a letter to the department making a request under the act for all records reviewed by Gfeller in connection with his report, including exhibit A, identified in the report as "National Practitioner Data Bank." After the department complied with the request in part but failed to produce, inter alia, exhibit A, the newspaper filed a complaint with the commission.[2] At a hearing before the commission, the department argued that exhibit A contained both Practitioner Data Bank and Healthcare Data Bank records and that federal law provided a basis to withhold these records. The commission concluded that federal regulations barred disclosure of records received from the Healthcare Data Bank, but that other regulations pertaining to the Practitioner Data Bank did not bar disclosure of records received from that data bank.

The department and the newspaper both appealed from the commission's decision to the Superior Court, which thereafter affirmed the decision and rendered judgment dismissing the appeals. The trial court determined that the department was required to disclose records that it had received from the Practitioner Data Bank under this court's decision in *Director of Health Affairs Policy Planning* v. *Freedom of Information Commission*, 293 Conn. 164, 180 n.13, 977 A.2d 148 (2009), but that different regulatory language addressing Healthcare Data Bank records that was not considered in that case precluded disclosure of those records. Appeals by both parties followed.[3] Thereafter, we granted permission to the United States of America to participate as amicus curiae.

On appeal, the department and the newspaper agree that the federal regulations governing confidentiality

of Practitioner Data Bank and Healthcare Data Bank records should be construed to have the same effect, despite certain textual differences, but disagree as to the proper construction. The commission, which had taken the position in its decision that these textual differences compelled different treatment, represented at oral argument before this court that its position has changed in light of a recent amendment to the governing regulations brought to its attention by the amicus curiae that makes clear that records from both data banks are not subject to disclosure. The commission further contends that this amendment is clarifying and, therefore, should be applied as the governing interpretation in the present case. The amicus contends in its brief that the statutes and implementing regulations of the United States Department of Health and Human Services (federal agency) always have precluded disclosure of records received from both data banks, and that the recent amendments merely clarify the regulations at issue. We conclude that any ambiguities in the regulatory scheme have been dispelled by the clarifying amendment, under which the records are not subject to public disclosure under the act.

Because the present case requires interpretation of federal statutes and regulations, we must interpret this scheme in accordance with federal law.[4] See *Commissioner of Correction* v. *Freedom of Information Commission*, 307 Conn. 53, 65–66, 52 A.3d 636 (2012); *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 470–71, 754 A.2d 128 (2000). Under federal law, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. . . . This presumption . . . applies to every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past . . . . Notwithstanding this presumption, several Courts of Appeals have held that when an amendment merely clarifies existing law, rather than effecting a substantive change to the law, then retroactivity concerns do not come into play." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Leshinsky* v. *Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 590 (S.D.N.Y. 2012); id., 590–91 (citing cases from Third, Fourth, Seventh, Ninth, Eleventh and D.C. Circuit Courts of Appeals). Although " '[t]here is no bright-line test' " for determining whether an amendment clarifies existing law; *Levy* v. *Sterling Holding Co., LLC*, 544 F.3d 493, 506 (3d Cir. 2008), cert. denied, 557 U.S. 919, 129 S. Ct. 2827, 174 L. Ed. 2d 553 (2009); decisions point to several factors for a court to consider: "(1) whether the text of the old regulation was ambiguous . . . (2) whether the new regulation resolved, or at least attempted to resolve, that ambiguity . . . (3) whether the new regulation's resolution of the ambigu-

ity is consistent with the text of the old regulation . . . and (4) whether the new regulation's resolution of the ambiguity is consistent with the agency's prior treatment of the issue . . . ." (Citations omitted.) Id., 507; see also *Middleton* v. *Chicago*, 578 F.3d 655, 663–65 (7th Cir. 2009) (court should consider: [1] whether enacting body declared that it was clarifying prior enactment; [2] whether conflict or ambiguity existed prior to amendment; and [3] whether amendment is consistent with reasonable interpretation of prior enactment and its legislative history). The fact that "an amendment alters, even significantly alters, the original statutory language . . . does not necessarily indicate that the amendment institutes a change in the law." (Internal quotation marks omitted.) *Brown* v. *Thompson*, 374 F.3d 253, 259 (4th Cir. 2004). Rather, the court will apply the relevant factors to determine whether the enacting body merely "[made] what was intended all along even more unmistakably clear." (Internal quotation marks omitted.) Id.

With this framework in mind, we turn first to the statutory and regulatory scheme in effect when the newspaper made its request for disclosure in November, 2009. The Health Care Quality Improvement Act of 1986 (1986 federal act),[5] which created the Practitioner Data Bank, was enacted to improve health care and address increasing medical malpractice that warranted greater efforts than those that could be undertaken by individual states. 42 U.S.C. § 11101 (1) (2006). The 1986 federal act: (1) encouraged effective professional peer review of physicians and licensed health care providers by providing immunity from liability under federal law for participants engaging in good faith review; 42 U.S.C. §§ 11101 and 11111 (2006); and (2) created a national database for information about adverse actions against such health care providers. Such adverse actions, which are required to be reported, include medical malpractice payments, sanctions from licensing boards, and certain professional review actions. See 42 U.S.C. §§ 11131 through 11133 (2006). State licensing boards, insurance companies making payments under a policy of insurance, hospitals and other health care entities are required to provide this information. 42 U.S.C. §§ 11131 through 11133 (2006). In turn, these health care entities are authorized, and in some cases have a duty, to request this information. 42 U.S.C. §§ 11135 and 11137 (a) (2006).

With respect to the use of information in the Practitioner Data Bank, the 1986 federal act provides in relevant part: "Information reported under this subchapter is considered confidential and shall not be disclosed (other than to the physician or practitioner involved) except with respect to professional review activity . . . or in accordance with regulations of the Secretary [of Health and Human Services (secretary) permitting disclosure for employment related deci-

sions]. *Nothing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclosure. . . .*" (Emphasis added.) 42 U.S.C. § 11137 (b) (1) (2006). The implementing regulation in turn provided: "Information reported to the [Practitioner Data Bank] is considered confidential and shall not be disclosed outside the [federal agency], except as specified in § 60.10, § 60.11 and § 60.14 [of title 45 of the Code of Federal Regulations]. *Persons and entities which receive information from the [Practitioner Data Bank] either directly or from another party must use it solely with respect to the purpose for which it was provided. Nothing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable State law to make such disclosure.*" (Emphasis added.) 45 C.F.R. § 60.13 (a) (2009).

Several years after it created the Practitioner Data Bank, Congress enacted the Health Insurance Portability and Accountability Act of 1996 (1996 federal act),[6] in which it authorized the creation of the Healthcare Data Bank—"a national health care fraud and abuse data collection program for the reporting of final adverse actions (not including settlements in which no findings of liability have been made) against health care providers, suppliers, or practitioners . . . ." 42 U.S.C. § 1320a-7e (a) (2006). Information in the Healthcare Data Bank is available to federal and state government agencies and health plans. 42 U.S.C. § 1320-7e (d) (1) (2006). There is ample evidence that the Healthcare Data Bank and the Practitioner Data Bank are complementary to each other. For example, adverse actions reported to the Healthcare Data Bank include some of the same information reported to the Practitioner Data Bank, such as licensure actions, as well as additional similar information. See 42 U.S.C. § 1320a-7e (b) (1) and (g) (1) (2006) (requiring reporting of, inter alia, civil judgments other than malpractice claims, criminal convictions, exclusion from participation in federal or state health care programs and actions by state and federal agencies responsible for licensing and certification decisions). Moreover, in implementing the Healthcare Data Bank, the secretary is directed to do so in a manner that avoids duplication of the reporting requirements of the Practitioner Data Bank under the 1986 federal act. 42 U.S.C. § 1320a-7e (f) (2006).

With respect to the confidentiality of Healthcare Data Bank records, the 1996 federal act provides no specific parameters but instead authorizes the secretary and the United States Attorney General to issue guidelines to carry out the program; 42 U.S.C. § 1320a-7c (a) (3) (A) (2006); including "procedures to assure that such information is provided and utilized in a manner that appropriately protects the confidentiality of the information and the privacy of individuals receiving health care

services and items." 42 U.S.C. § 1320a-7c (a) (3) (B) (ii) (2006). The implementing regulation in turn provided: "Information reported to the [Healthcare Data Bank] is considered confidential and will not be disclosed outside the [federal agency], except as specified in [45 C.F.R.] §§ 61.12 and 61.15. *Persons and entities receiving information from the [Healthcare Data Bank], either directly or from another party, must use it solely with respect to the purpose for which it was provided. Nothing in this section will prevent the disclosure of information by a party from its own files used to create such reports where disclosure is otherwise authorized under applicable State or Federal law*." (Emphasis added.) 45 C.F.R. § 61.14 (2009).

A comparison of those sections of the Practitioner Data Bank and Healthcare Data Bank regulations that provide an exception to the circumscribed limits to disclosure reveals a clear textual difference. Whereas the Healthcare Data Bank regulation provides that "[n]othing in this section will prevent the disclosure of information by a party *from its own files used to create such reports* where disclosure is otherwise authorized under applicable State or Federal law"; (emphasis added) 45 C.F.R. § 61.14 (2009); the Practitioner Data Bank regulation contains no such language. Cf. 45 C.F.R. § 60.13 (a) (2009) ("[n]othing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable State law to make such disclosure"). If we were to view the Healthcare Data Bank regulation in isolation, we undoubtedly would be compelled to conclude that the commission could not order a public agency to disclose information received from the Healthcare Data Bank but could only order disclosure of information from the agency's own files that had been provided to the Healthcare Data Bank. Review of the Practitioner Data Bank regulation in isolation might yield a different conclusion because of the absence of the phrase "from its own files used to create such reports." Indeed, this court reached precisely that conclusion in *Director of Health Affairs Policy Planning* v. *Freedom of Information Commission*, supra, 293 Conn. 180 n.13 (summarily concluding, in reliance on last sentence of 45 C.F.R. § 60.13 [a], that, because disclosure was authorized under act, disclosure was permitted under regulation).

There is persuasive evidence, however, that despite this textual difference, the regulations were intended to be construed consistently. As we previously have explained, some of the same information collected in the Healthcare Data Bank also is provided to the Practitioner Data Bank. It would be incongruous to conclude that information in Healthcare Data Bank records is not subject to disclosure yet that same information is subject to disclosure once provided to the Practitioner Data Bank. There did not appear to be any mechanism to segregate these records to avoid this problem. See

45 C.F.R. § 61.1 (b) (2009) (noting that "[the federal agency's] consolidated reporting mechanism . . . will sort the appropriate actions into the [Healthcare Data Bank], [the Practitioner Data Bank], *or both*" [emphasis added]).

In order to construe the regulations consistently, however, we would need to either treat as superfluous the language in the Healthcare Data Bank regulation referring to records created from a party's own files or engraft such language as a judicial gloss onto the Practitioner Data Bank regulation. Although the former approach would yield a result consistent with this court's conclusion in *Director of Health Affairs Policy Planning*,[7] there are strong indications that the latter is consistent with the intent of Congress and the federal agency implementing the federal acts. First, precluding public disclosure would be consistent with the requirement barring an entity from using information received from the data banks for any purpose other than the one for which the records were provided. 45 C.F.R. §§ 60.13 (a) and 61.14 (2009). Indeed, a regulation providing for a civil penalty against persons who improperly disclose, use or permit access to information reported in accordance with the scheme, provides: "The disclosure of information reported in accordance with part B of title IV in response to a subpoena or a discovery request is considered to be an improper disclosure in violation of [42 U.S.C. § 11137]. However, disclosure or release by an entity of *original documents or underlying records from which the reported information is obtained or derived is not considered to be an improper disclosure* in violation of [42 U.S.C. § 11137]." (Emphasis added.) 42 C.F.R. § 1003.102 (b) (6) (2009). Thus, the regulation indicates a distinction between the sources of the information as determinative of whether disclosure is permissible. Second, in the statute addressing disclosure of Practitioner Data Bank records, it first addresses limits on disclosure of information "reported" to the Practitioner Data Bank and then provides in the sentence that immediately follows: "Nothing in this subsection shall prevent the disclosure of *such* information by a party which is otherwise authorized, under applicable State law, to make such disclosure." (Emphasis added.) 42 U.S.C. § 11137 (b) (1) (2006). When read in context, "such information" appears to refer to information reported to the Practitioner Data Bank, meaning from the party's own files.[8] Third, this construction is consistent with the one publicly articulated by the implementing federal agency since 2001. See U.S. Dept. of Health and Human Services, Health Resources and Services Administration, "National Practitioner Data Bank Guidebook," (September 2001) pp. A-4 and A-5, available at http://www.ire.org/media/uploads/files/datalibrary/npdb/guidebook.pdf (last visited March 12, 2014). Finally, we note that this construction would avoid the anomaly of permitting public disclosure of information

submitted to the data banks from a state whose law would bar public disclosure of that information.

Whatever ambiguity might have remained has been dispelled by the recent amendments to the governing scheme. Under § 6403 of the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 763, "the Secretary [is required] to establish a transition period to transfer all data in the [Healthcare Data Bank] to the [Practitioner Data Bank], and, once completed, to cease operations of the [Healthcare Data Bank]. Information previously collected and disclosed to eligible parties through the [Healthcare Data Bank] will then be collected and disclosed to eligible parties through the [Practitioner Data Bank]." 78 Fed. Reg. 20,473; see also id., 20,474 ("[§] 6403 . . . eliminate[s] duplication between the [Healthcare Data Bank] and the [Practitioner Data Bank]"). The new regulation, effective May 6, 2013, prescribes limitations on the disclosure of data bank information following this consolidation: "Information reported to the [Practitioner Data Bank] is considered confidential and shall not be disclosed outside the [federal agency], except as specified in §§ 60.17, 60.18, and 60.21 of this part. Persons and entities receiving information from the [Practitioner Data Bank], either directly or from another party, must use it solely with respect to the purpose for which it was provided. *The Data Bank report may not be disclosed*, but nothing in this section will prevent the disclosure of information *by a party from its own files used to create such reports* where disclosure is otherwise authorized under applicable state or Federal law." (Emphasis added.) 45 C.F.R. § 60.20 (a) (2013). Thus, there is no question that, under current law, the newspaper would not be entitled to either Practitioner Data Bank records or Healthcare Data Bank records, but nonetheless could receive information subject to disclosure under the act that the department had obtained independently from other sources in its own files.

Notably, the federal agency, in response to a comment on the final rules requesting clarification as to whether Practitioner Data Bank records would be subject to disclosure under a state freedom of information act, explained that the new regulations did not change the current disclosure limitations, that the change from the existing Practitioner Data Bank regulation was "clarifying language,"[9] and that disclosure would not be permitted under such acts except as to information from a party's own files that had been used to create the report. See 78 Fed. Reg. 20,473, 20,483;[10] see also id. (explaining in "Summary of Revisions in the Final Rule" that federal agency had "modified language in this section to *clarify* that a Data Bank report itself may not be disclosed, except as permitted by [45 C.F.R.] §§ 60.17, 60.18, and 60.21 [2013]" [emphasis added]); 77 Fed. Reg. 9138, 9149 (The federal agency, in its notice of the proposed rule, explained: "We propose to slightly

amend redesignated [45 C.F.R.] § 60.20 so that it reflects the limitations on disclosure provisions *based on current* [*Practitioner Data Bank*] *and* [*Healthcare Data Bank*] *regulatory language.* These confidentiality requirements would apply to all information obtained from the [Practitioner Data Bank]." [Emphasis added.]).

We conclude that the federal statutory and regulatory schemes in effect when the newspaper made its request strongly suggest that records received from both the Practitioner Data Bank and the Healthcare Data Bank would not be subject to disclosure under the act. We further conclude that this interpretation is confirmed by the subsequent, clarifying enactments. See *Erlenbaugh* v. *United States*, 409 U.S. 239, 243–44, 93 S. Ct. 477, 34 L. Ed. 2d 446 (1972) ("a later act can . . . be regarded as a legislative interpretation of [an] earlier act . . . in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting, and is therefore entitled to great weight in resolving any ambiguities and doubts" [internal quotation marks omitted]). Contrary to the newspaper's suggestion, we do not find it significant that the amended regulation, 45 C.F.R. § 60.20 (2013), was made effective on May 6, 2013. This regulation was adopted in connection with the consolidation of the two data banks, for which it was necessary to provide a transition period. In addition, the new regulation simply confirms the most reasonable interpretation of the existing schemes. Finally, we note that the clarifying language is not, as a substantive matter, applied retroactively because the clarification simply makes clear what the law meant all along. See *Commissioner of Internal Revenue* v. *Wheeler*, 324 U.S. 542, 546, 65 S. Ct. 799, 89 L. Ed. 1166 (1945) ("if the regulation itself was valid and effective, the [later] clarifying amendment . . . added nothing to the liability of these taxpayers, and even though the Tax Court relied on it rather than on the regulation, no question of retroactivity is presented"); *ABKCO Music, Inc.* v. *LaVere*, 217 F.3d 684, 689 (9th Cir.) ("[i]f . . . [the statute] merely clarifies what [the prior statute] was originally intended to mean . . . it has no retroactive effect that might be called into constitutional question" [internal quotation marks omitted]), cert. denied, 531 U.S. 1051, 121 S. Ct. 655, 148 L. Ed. 2d 559 (2000); *Whalen* v. *United States*, 826 F.2d 668, 670–71 (7th Cir. 1987) ("We hold that [the statute], as originally enacted in 1976, required that property be passed to a qualified heir in order to qualify for special use valuation. As such, the 1978 clarifying amendment to that section did not change the law and was not retroactive in any substantive sense.").

The judgment is affirmed with respect to the newspaper's cross appeal; the judgment is reversed with respect to the department's appeal and the case is remanded to the trial court with direction to render judgment sustaining the department's appeal.

In this opinion the other justices concurred.

[1] The Commissioner of Public Health acts on behalf of the Department of Public Health and references in this opinion to the department include the commissioner.

[2] The department also refused to produce Jane Smith's medical records, which were part of exhibit C to Gfeller's report. Jane Smith and John Smith intervened in the proceedings before the commission to contest disclosure of these records. The commission concluded that these records were not subject to disclosure, and the newspaper did not contest this determination on appeal. We therefore limit our discussion to the commission's decision insofar as it addressed the data bank records.

[3] The department appealed and the newspaper cross appealed to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] The parties and the amicus have briefed at some length: (1) whether federal law requires this court to defer to the federal agency's construction of the statutes and its own regulations, including its construction as reflected in a letter from that federal agency to Connecticut's Office of the Attorney General while the present case was pending before the commission, a 2001 guidebook published by that federal agency, and subsequent amendments to the regulations; and (2) whether this court's construction of one of the regulations in *Director of Health Affairs Policy Planning* v. *Freedom of Information Commission*, supra, 293 Conn. 180 n.13, which is at odds with the federal agency's construction, should be reconsidered in the absence of this court's consideration of whether the federal agency had adopted an interpretation that should be afforded deference.

Under federal law, as a general rule, courts are required to defer to an agency's reasonable construction of an ambiguous statute that the agency is charged with implementing; see *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) (*Chevron*); as well as an agency's reasonable construction of its own ambiguous regulation. See *Auer* v. *Robbins*, 519 U.S. 452, 461–62, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997). There are, however, limitations to such deference. See generally *Christopher* v. *SmithKline Beecham Corp.*, U.S. , 132 S. Ct. 2156, 2166–67, 183 L. Ed. 2d 153 (2012) (citing circumstances in which deference is not afforded to agency interpretation). Under those circumstances in which deference is not afforded, the agency's interpretation nonetheless is entitled to respect, but only to the extent that its interpretation has the power to persuade. See *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944). Whether *Chevron/Auer* deference or *Skidmore*'s less deferential standard applies, however, is not always clear in light of various factors that the United States Supreme Court has articulated in an evolving line of cases. See generally 1 R. Pierce, Administrative Law (5th Ed. 2010) § 3.5, p. 172 ("Since 2000, the [United States Supreme] Court has issued over a dozen opinions in which it has attempted to clarify the scope of *Chevron*. Unfortunately, the only thing that emerges clearly from these opinions is that the Justices differ significantly with respect to their views on the scope of *Chevron*.").

In the present case, the applicable standard is called into question by the fact that the critical sentence at issue in one of the regulations mirrors the statutory language; see *Gonzales* v. *Oregon*, 546 U.S. 243, 257, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006) (declining to afford *Auer* deference when "the underlying regulation does little more than restate the terms of the statute itself"); as well as the nature of the evidence on which the amicus relies—including an opinion letter and a guidebook. Compare id. (declining to afford deference when circumstance in which interpretation was expounded was not one that Congress would have thought of as deserving deference), *Coeur Alaska, Inc.* v. *Southeast Alaska Conservation Council*, 557 U.S. 261, 283–84, 129 S. Ct. 2458, 174 L. Ed. 2d 193 (2009) (no substantial deference to memorandum issued by agency), and *Christensen* v. *Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) (no deference to policy statements, agency manuals, and enforcement guidelines), with *Auer* v. *Robbins*, supra, 519 U.S. 462 (deference to interpretation articulated in legal brief). Because our interpretation is consistent with the federal agency's own interpretation and relies on the federal agency's pronouncements to the extent that they are persuasive, we conclude that we need not determine whether *Chevron/Auer* deference is required. Cf. *Edelman* v. *Lynchburg College*, 535 U.S. 106, 114, 122 S. Ct. 1145, 152 L. Ed. 2d 188 (2002) ("[T]here is no need to resolve any question of deference here. We find the [agency's] rule not only a reasonable one, but the position we would adopt even if there were no formal rule and we were interpreting the statute from scratch. Because we so clearly agree with the [agency], there is no occasion to defer

and no point in asking what kind of deference, or how much.").

⁵ See Pub. L. No. 99-660, tit. IV, as amended by Pub. L. No. 100-177, § 402. The Practitioner Data Bank was expanded by § 1921 of the Social Security Act, as amended by § 5 (b) of the Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, and as amended by the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508. See 78 Fed. Reg. 20,473. For convenience, we refer to these laws collectively as the 1986 federal act.

⁶ See 78 Fed. Reg. 20,473 (§ 1128E of the Social Security Act as added by § 221 (a) of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191).

⁷ The principal issue in *Director of Health Affairs Policy Planning* v. *Freedom of Information Commission*, supra, 293 Conn. 164, was whether peer review records created by a state public agency were exempt from disclosure under the act pursuant to General Statutes § 19a-17b (d). The plaintiff agency offered no interpretation of the last sentence of 45 C.F.R. § 60.13 (a) in its brief to this court, and we did not have the benefit of briefing from the federal government. Although "our adherence to the doctrine of stare decisis serves the fundamental interest of our judicial system in stability and consistency . . . [i]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations. . . . This principle is particularly appropriate when we interpret federal law, as we do in this case, because in such a case our state legislature is powerless to correct our errors." (Citations omitted; internal quotation marks omitted.) *Ross* v. *Giardi*, 237 Conn. 550, 570–71, 680 A.2d 113 (1996). Our review of the evidence marshaled by the amicus, the recent amendments, and the history of the amendments "convinces us that we must modify our analysis in order to reflect accurately the . . . intent embodied in [the federal scheme]." Id., 571. Accordingly, we reject the conclusion of *Director of Health Affairs Policy Planning* to the limited extent that it is inconsistent with the reasoning of this opinion.

⁸ The regulation confuses this context by inserting the intervening sentence that provides: "Persons and entities which *receive* information from the [Practitioner Data Bank] either directly or from another party must use it solely with respect to the purpose for which it was provided." (Emphasis added.) 45 C.F.R. § 60.13 (a) (2009).

⁹ Drawing on case law from the United States Supreme Court and other Circuit Courts of Appeals, the Eleventh Circuit Court of Appeals has explained: "[C]ourts may rely upon a declaration by the enacting body that its intent is to clarify the prior enactment. . . . Courts should examine such declarations carefully, however, especially if the declarations are found in the amendment's legislative history rather than the text of the amendment itself. . . . As a general rule, [a] mere statement in a conference report of [subsequent] legislation as to what the [c]ommittee believes an earlier statute meant is obviously less weighty than a statement in the amendment itself. . . . Declarations in the subsequent legislative history nonetheless may be relevant to this analysis, especially if the legislative history is consistent with a reasonable interpretation of the prior enactment and its legislative history." (Citations omitted; internal quotation marks omitted.) *Cortes* v. *American Airlines, Inc.*, 177 F.3d 1272, 1284 (11th Cir. 1999), cert. denied, 528 U.S. 1136, 120 S. Ct. 980, 145 L. Ed. 2d 930 (2000).

¹⁰ "Two commenters asked [the Health Resources and Services Administration of the federal agency charged with promulgating the regulations (agency)] to describe to what extent [Practitioner Data Bank] confidentiality would be protected and whether state Freedom of Information Acts (FOIA) would apply to the information contained in the [Practitioner Data Bank]. Another commenter asked [the agency] to revise language in this section to strike the phrase 'from its own files to create such reports' regarding the disclosure of information by a party under applicable state or Federal law. This third commenter expressed concerns that this inserted language might invite researchers and others to seek out the reporting entity to ask for information from the entities' own files and felt that the proposed change was 'superfluous'.

"Response: Information reported to the [Practitioner Data Bank] is considered confidential, and access to and use of the information is prescribed by the three statutes that govern the [Practitioner Data Bank]. As stated in [45 C.F.R.] § 60.20 [2013], 'Persons and entities receiving information from the [Practitioner Data Bank], either directly or from another party, must use it solely with respect to the purpose for which it was provided.' Both improper use and access to [Practitioner Data Bank] information may result in a civil monetary penalty that is currently set at up to $11,000 for each violation. The Privacy Act also protects the contents of Federal records on

individuals from disclosure without the individual's consent, unless the disclosure is for a routine use of the system of records as published annually in the Federal Register. The published routine uses of [Practitioner Data Bank] information, which are based on the laws and the regulations under which the [Practitioner Data Bank] operates, do not allow disclosure to the general public. *Given these statutory restrictions on [Practitioner Data Bank] information, [Practitioner Data Bank] information is not releasable through FOIA.*

"The confidentiality provisions prohibit the release of the report submitted to the Data Bank. These provisions, though, do not apply to the original documents or records from which the reported information is obtained. *The [Practitioner Data Bank's] confidentiality provisions do not impose any new confidentiality requirements or restrictions on those documents or records.* Thus, the confidentiality provisions do not bar or restrict the release of the underlying documents, or the information itself, by the entity taking the adverse action or making the payment in settlement of a written medical malpractice complaint or claim. For this reason we inserted *clarifying* language in [45 C.F.R.] § 60.20 [2013], *which already existed in the [Health-care Data Bank] regulations*, stating that an entity is free to release information 'from its own files' provided that such disclosure is otherwise permitted by state and Federal law.

"This provision allows the disclosure of information used to create [a Practitioner Data Bank] report, consistent with other legal requirements, however it does not permit the release of the [Practitioner Data Bank] report itself. So, for instance, *if a state FOIA law requires the release of records*, *while it may require the release of the records underlying the report, it would not permit the release of the [Practitioner Data Bank] report itself.*" (Emphasis added.) 78 Fed. Reg. 20,473, 20,483.

---